# Exhibit 1

# Confidential Information and Invention Assignment Agreement

## KNIGHT CAPITAL GROUP, INC.

## CONFIDENTIAL INFORMATION AND
## INVENTION ASSIGNMENT AGREEMENT

As a condition of my employment with Knight Capital Group, Inc., its subsidiaries, affiliates, successors or assigns (together, the "**Company**"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following:

1.  **Confidential Information**.

At all times during the term of my employment and thereafter, I will hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization any Confidential Information. "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, passwords, login Ids, encryption keys, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment and any such information received from a third party under a duty of confidentiality; provided, however, that Confidential Information does not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

2.  **Intellectual Property**.

(a)  **Assignment of Intellectual Property**. I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and shall and hereby do assign to the Company, or its designee, all my right, including any future right, title, and interest in and to any and all ideas, concepts, know-how, processes, methods, inventions, trade secrets, discoveries, designs, developments, software, works of authorship, devices, techniques, improvements, and all copyrights, patents, trade secrets and other intellectual property rights in the same, in each case whether or not patentable or including Confidential Information, that I may solely or jointly with others contribute, conceive, develop or reduce to practice, or cause to be contributed, conceived, developed or reduced to practice, that arise out of or relate to work performed during the period of time I am in the employ of the Company, whether or not during work hours (the "**Developed Inventions**").

(b)  **Intellectual Property Registrations**. I agree to assist the Company, or its designee, at the Company's expense but without additional compensation to me, in every proper way to secure, protect and enforce the Company's rights in all Developed Inventions in all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns and nominees the sole and exclusive rights, title and interest in and to the Developed Inventions. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement.

3.    **Returning Company Documents**.  I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) the Confidential Information, including, but not limited to, any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns.

4.    **Notification of New Employer**.  In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

5.    **Conflict of Interest Guidelines**.  I agree to diligently adhere to the Conflict of Interest Guidelines.

6.    **Equitable Relief**.

        **Equitable Remedies**.  I agree that it would be impossible to measure and calculate the Company's damages from any breach of the covenants set forth in **Section 1** herein.  Accordingly, I agree that if I breach any of such Section, the Company will be entitled to, in addition to any other right or remedy available, an injunction from a court of competent jurisdiction restraining such breach or threatened breach and to specific performance of any such provision of this Agreement.  I further agree that no bond or other security or proof of actual damages shall be required in obtaining such equitable relief and I hereby consent to the issuance of such injunction and to the ordering of specific performance.

7.    **General Provisions**.

        **(a)**    **Governing Law; Consent to Personal Jurisdiction**.  This Agreement will be governed by the internal laws of the State of New York, without regard to conflict of laws principles.  I hereby expressly consent to the personal jurisdiction of the state and federal courts located in New York for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

        **(b)**    **Entire Agreement**.  This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us.  No modification of or amendment to this Agreement, nor any waiver of any rights under this agreement, will be effective unless in writing signed by the party to be charged.  Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

        **(c)**    **Severability**.  If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

        **(d)**    **Successors and Assigns**.  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.


I REPRESENT AND WARRANT THAT (A) I HAVE READ AND UNDERSTOOD EACH AND EVERY PROVISION OF THIS AGREEMENT, (B) I HAVE HAD THE OPPORTUNITY TO OBTAIN ADVICE FROM LEGAL COUNSEL OF MY CHOOSING IN ORDER TO INTERPRET THE PROVISIONS OF THIS AGREEMENT, (C) I HAVE HAD THE OPPORTUNITY TO ASK THE CORPORATION QUESTIONS ABOUT THIS AGREEMENT AND SUCH QUESTIONS HAVE BEEN

ANSWERED TO MY SATISFACTION, AND (D) I HAVE BEEN GIVEN A COPY OF THIS AGREEMENT.

Date: 05/28/2013

_Evan Wright_
Signature

_Evan Wright_
Name of Employee (typed or printed)
Social Security No.:
Address:

Witness

# Exhibit 2

# Virtu Financial, Inc. Amended and Restated 2015 Management Incentive Plan

# ANNEX A: AMENDED VIRTU FINANCIAL, INC. AMENDED AND RESTATED 2015 MANAGEMENT INCENTIVE PLAN

**First Amendment to**
**Virtu Financial, Inc. Amended and Restated 2015 Management Incentive Plan**

The Amended and Restated Management Incentive Plan (the "*Plan*") of Virtu Financial, Inc., a Delaware corporation (the "*Company*"), is hereby amended, effective as of April 22, 2020 (the "*Effective Date*"), as follows:

1.   **Amendment to Section 5(b) of the Plan**.     Section 5(b) of the Plan is hereby amended so that the references to "16,000,000" in Section 5(b)(i) and (iii) are deleted and replaced with "21,000,000".

2.   **Effectiveness**.     In accordance with Section 14(a) of the Plan, the effectiveness of this Amendment to the Plan (this "*Amendment*") is subject to the approval of the Company's stockholders at the Company's 2020 annual general meeting of stockholders. For the avoidance of doubt, if stockholder approval is not obtained, then this Amendment shall be void *ab initio* and of no force and effect.

3.   **Effect on the Plan**.     This Amendment shall not constitute a waiver, amendment or modification of any provision of the Plan not expressly referred to herein. Except as expressly amended or modified herein, the provisions of the Plan are and shall remain in full force and effect and are hereby ratified and confirmed. On and after the Effective Date, each reference in the Plan to "this Plan," "herein," "hereof," "hereunder" or words of similar import shall mean and be a reference to the Plan as amended hereby. To the extent that a provision of this Amendment conflicts with or differs from a provision of the Plan, such provision of this Amendment shall prevail and govern for all purposes and in all respects.

**Virtu Financial, Inc. Amended and Restated 2015 Management Incentive Plan**

1.   **Purpose and History.**    The Virtu Financial, Inc. Amended and Restated 2015 Management Incentive Plan (the "***Plan***") is intended to help Virtu Financial, Inc., a Delaware corporation (including any successor thereto, the "***Company***") and its Affiliates (i) attract and retain key personnel by providing them the opportunity to acquire an equity interest in the Company or other incentive compensation measured by reference to the value of Common Stock and (ii) align the interests of key personnel with those of the Company's shareholders. The Virtu Financial, Inc. 2015 Management Incentive Plan was originally adopted by the Board on April 3, 2015.

2.   **Effective Date; Duration.**    The Plan shall be effective as of June 30, 2017 (the "***Effective Date***"). The expiration date of the Plan, on and after which date no Awards may be granted, shall be the tenth anniversary of the Effective Date; *provided*, *however*, that such expiration shall not affect Awards then outstanding, and the terms and conditions of the Plan shall continue to apply to such Awards.

3.   **Definitions.**    The following definitions shall apply throughout the Plan.

   (a)  "*Affiliate*" means (i) any person or entity that directly or indirectly controls, is controlled by or is under common control with the Company and/or (ii) to the extent provided by the Committee, any person or entity in which the Company has a significant interest. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as applied to any person or entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person or entity, whether through the ownership of voting or other securities, by contract or otherwise.

   (b)  "*Award*" means, individually or collectively, any Incentive Stock Option, Nonqualified Stock Option, Stock Appreciation Right, Restricted Stock, Restricted Stock Unit, Other Stock-Based Award and/or Performance Compensation Award granted under the Plan.

   (c)  "*Beneficial Ownership*" has the meaning set forth in Rule 13d-3 promulgated under Section 13 of the Exchange Act.

   (d)  "*Board*" means the Board of Directors of the Company.

   (e)  "*Cause*" means, in the case of a particular Award, unless the applicable Award agreement states otherwise, the Company or an Affiliate having "cause" to terminate the Participant's employment or service, (i) as such term is defined in any employment, consulting, change-in-control, severance or any other agreement between the Participant and the Company or an Affiliate in effect at the time of such termination or (ii) in the absence of any such employment, consulting, change-in-control, severance or other agreement (or the absence of any definition of "cause" or term of similar import therein), due to the Participant's (A) willful misconduct or gross neglect of his duties; (B) having engaged in conduct harmful (whether financially, reputationally or otherwise) to the Company or an Affiliate; (C) failure or refusal to perform his duties; (D) conviction of, or guilty or no contest plea to, a felony or any crime involving dishonesty or moral turpitude; (E) willful violation of the written policies of the Company or an Affiliate; (F) misappropriation or misuse of Company or Affiliate funds or property or other act of personal dishonesty in connection with his employment; or (G) willful breach of fiduciary duty. The determination of whether Cause exists shall be made by the Committee in its sole discretion.

   (f)  "*Change in Control*" shall, in the case of a particular Award, unless the applicable Award agreement (or any employment, consulting, change-in-control, severance or other agreement between the

   Participant and the Company or an Affiliate) states otherwise, be deemed to occur upon any of the following events:

      (i)  the acquisition by any Person of Beneficial Ownership of 30% or more (on a fully diluted basis) of either (A) the then outstanding shares of Common Stock, including Common Stock issuable upon the exercise of options or warrants, the conversion of convertible stock or debt, and the exercise of any similar right to acquire such Common Stock (including, but not limited, to the exercise of any rights to exchange non-voting common interest units of Virtu Financial LLC and paired shares of Class C common stock or Class D common stock for shares of Class A Common Stock or Class B common stock, and any rights to exchange or convert Class B common stock for Class A Common Stock); or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote in the election of directors (the "***Outstanding***



2020 Proxy Statement                                                                                                                                73

Table of Contents

**Company Voting Securities**"); but excluding any acquisition by the Company or any of its Affiliates, or by Vincent Viola, his Permitted Transferees or any of their respective Affiliates or by any employee benefit plan sponsored or maintained by the Company or any of its Affiliates;

(ii)  a change in the composition of the Board such that members of the Board during any consecutive 12-month period (the "**Incumbent Directors**") cease to constitute a majority of the Board. Any person becoming a director through election or nomination for election approved by a valid vote of at least two-thirds of the Incumbent Directors shall be deemed an Incumbent Director; *provided*, *however*, that no individual becoming a director as a result of an actual or threatened election contest, as such terms are used in Rule 14a-12 of Regulation 14A promulgated under the Exchange Act, or as a result of any other actual or threatened solicitation of proxies or consents by or on behalf of any person other than the Board shall be deemed to be an Incumbent Director;

(iii)  the approval by the shareholders of the Company of a plan of complete dissolution or liquidation of the Company; or

(iv)  the consummation of a reorganization, recapitalization, merger, consolidation, statutory share exchange or similar form of corporate transaction involving the Company (a "**Business Combination**"), or sale, transfer or other disposition of all or substantially all of the business or assets of the Company to an entity that is not an Affiliate of the Company (a "**Sale**"), unless immediately following such Business Combination or Sale: (A) more than 50% of the total voting power of the entity resulting from such Business Combination or the entity that acquired all or substantially all of the business or assets of the Company in such Sale (in either case, the "**Surviving Company**"), or the ultimate parent entity that has Beneficial Ownership of sufficient voting power to elect a majority of the board of directors (or analogous governing body) of the Surviving Company (the "**Parent Company**"), is represented by the Outstanding Company Voting Securities that were outstanding immediately prior to such Business Combination or Sale (or, if applicable, is represented by shares into which the Outstanding Company Voting Securities were converted pursuant to such Business Combination or Sale), and such voting power among the holders thereof is in substantially the same proportion as the voting power of the Outstanding Company Voting Securities among the holders thereof immediately prior to the Business Combination or Sale, (B) no Person (other than any employee benefit plan sponsored or maintained by the Surviving Company or the Parent Company), is or becomes the beneficial owner, directly or indirectly, of 30% or more of the total voting power of the outstanding voting securities eligible to elect members of the board of directors (or the analogous governing body) of the Parent Company (or, if there is no Parent Company, the Surviving Company) and (C) at least a majority of the members of the board of directors (or the analogous governing body) of the Parent Company (or, if there is no Parent Company, the Surviving Company) following the consummation of the Business Combination or Sale were Board members at the time of the Board's approval of the execution of the initial agreement providing for such Business Combination or Sale.

(g)  "*Class A Common Stock*" means the Class A common stock of the Company, par value $0.00001 per share (and any stock or other securities into which such common shares may be converted or into which it may be exchanged).

(h)  "*Class B Common Stock*" means the Class B common stock of the Company, par value $0.00001 per share.

(i)  "*Class C Common Stock*" means the Class C common stock of the Company, par value $0.00001 per share.

(j)  "*Class D Common Stock*" means the Class D common stock of the Company, par value $0.00001 per share.

(k)  "*Code*" means the U.S. Internal Revenue Code of 1986, as amended, and any successor thereto. References to any section of the Code shall be deemed to include any regulations or other interpretative guidance under such section, and any amendments or successors thereto.

(l)  "*Committee*" means the Compensation Committee of the Board or subcommittee thereof if required with respect to actions taken to obtain the exception for performance-based compensation under Section 162(m) of the

Table of Contents

Code or to comply with Rule 16b-3 promulgated under the Exchange Act in respect of Awards or, if no such Compensation Committee or subcommittee thereof exists, the Board.

(m) "*Common Stock*" means collectively or individually the Class A Common Stock.

(n) "*Disability*" means cause for termination of the Participant's employment or service due to a determination that the Participant is disabled in accordance with a long-term disability insurance program maintained by the Company or a determination by the U.S. Social Security Administration that the Participant is totally disabled.

(o) "*Eligible Person*" means any (i) individual employed by the Company or an Affiliate; *provided, however*, that no such employee covered by a collective bargaining agreement shall be an Eligible Person; (ii) director or officer of the Company or an Affiliate; (iii) consultant or advisor to the Company or an Affiliate who may be offered securities registrable on Form S-8 under the Securities Act; or (iv) prospective employee, director, officer, consultant or advisor who has accepted an offer of employment or consultancy from the Company or its Affiliates (and would satisfy the provisions of clauses (i) through (iii) above once he begins employment with or providing services to the Company or its Affiliates.

(p) "*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended, and any successor thereto. References to any section of (or rule promulgated under) the Exchange Act shall be deemed to include any rules, regulations or other interpretative guidance under such section or rule, and any amendments or successors thereto.

(q) "*Fair Market Value*" means, on a given date, (i) if the Common Stock is listed on a national securities exchange, the closing sales price of the Common Stock reported on such exchange on such date, or, if there is no such sale on that date, then on the last preceding date on which such a sale was reported; or (ii) if the Common Stock is not listed on any national securities exchange, the amount determined by the Committee in good faith to be the fair market value of the Common Stock.

(r) "*Incentive Stock Option*" means an Option which is designated by the Committee as an incentive stock option as described in Section 422 of the Code and otherwise meets the requirements set forth in the Plan.

(s) "*NASDAQ*" means The Nasdaq Global Market.

(t) "*Nonqualified Stock Option*" means an Option which is not designated by the Committee as an Incentive Stock Option.

(u) "*Option*" means an Award granted under Section 7 of the Plan.

(v) "*Performance Compensation Award*" means an Award designated by the Committee as a Performance Compensation Award pursuant to Section 11 of the Plan.

(w) "*Performance Criteria*" shall mean the criterion or criteria that the Committee shall select for purposes of establishing the Performance Goal(s) for a Performance Period with respect to any Performance Compensation Award under the Plan.

(x) "*Performance Formula*" shall mean, for a Performance Period, the one or more objective formulae applied against the relevant Performance Goal to determine, with regard to the Performance Compensation Award of a particular Participant, whether all, some portion but less than all, or none of the Performance Compensation Award has been earned for the Performance Period.

(y) "*Performance Goals*" shall mean, for a Performance Period, the one or more goals established by the Committee for the Performance Period based upon the Performance Criteria.

(z) "*Performance Period*" shall mean the one or more periods of time as the Committee may select, over which the attainment of one or more Performance Goals will be measured for the purpose of determining the Participant's right to, and the payment of, a Performance Compensation Award.

(aa) "*Person*" has the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a



corporation owned, directly or indirectly, by the shareholders of the Company in substantially the same proportions as their ownership of Common Stock of the Company.

(bb)  "*Restricted Stock*" means an Award of Common Stock, subject to certain specified restrictions, granted under Section 9 of the Plan.

(cc)  "*Restricted Stock Unit*" means an Award of an unfunded and unsecured promise to deliver shares of Common Stock, cash, other securities or other property, subject to certain specified restrictions, granted under Section 9 of the Plan.

(dd)  "*Securities Act*" means the U.S. Securities Act of 1933, as amended, and any successor thereto. Reference in the Plan to any section of (or rule promulgated under) the Securities Act shall be deemed to include any rules, regulations or other interpretative guidance under such section or rule, and any amendments or successor provisions to such section, rules, regulations or guidance.

(ee)  "*Stock Appreciation Right*" or "*SAR*" means an Award granted under Section 8 of the Plan.

4.   **Administration.**

(a)  The Committee shall administer the Plan, and shall have the sole and plenary authority to: (i) designate Participants; (ii) determine the type, size, and terms and conditions of Awards to be granted; (iii) determine the method by which an Award may be settled, exercised, canceled, forfeited, or suspended; (iv) determine the circumstances under which the delivery of cash, property or other amounts payable with respect to an Award may be deferred either automatically or at the Participant's or Committee's election; (v) interpret and administer, reconcile any inconsistency in, correct any defect in and/or supply any omission in the Plan and any Award granted under, the Plan; (vi) establish, amend, suspend, or waive any rules and regulations and appoint such agents as the Committee shall deem appropriate for the proper administration of the Plan; (vii) accelerate the vesting, delivery or exercisability of, payment for or lapse of restrictions on, or waive any condition in respect of, Awards; and (viii) make any other determination and take any other action that the Committee deems necessary or desirable for the administration of the Plan or to comply with any applicable law, including Section 162(m) of the Code. To the extent required to comply with the provisions of Rule 16b-3 promulgated under the Exchange Act (if applicable and if the Board is not acting as the Committee under the Plan) or necessary to obtain the exception for performance-based compensation under Section 162(m) of the Code, or any exception or exemption under the rules of NASDAQ or any other securities exchange or inter-dealer quotation service on which the Common Stock is listed or quoted, as applicable, it is intended that each member of the Committee shall, at the time he takes any action with respect to an Award under the Plan, be (i) a "non-employee director" within the meaning of Rule 16b-3 promulgated under the Exchange Act and (ii) an "outside director" within the meaning of Section 162(m) of the Code and/or (iii) an "independent director" under the rules of NASDAQ or any other securities exchange or inter-dealer quotation service on which the Common Stock is listed or quoted (*"**Eligible Director**"*). However, the fact that a Committee member shall fail to qualify as an Eligible Director shall not invalidate any Award granted or action taken by the Committee that is otherwise validly granted or taken under the Plan.

(b)  The Committee may allocate all or any portion of its responsibilities and powers to any one or more of its members and may delegate all or any part of its responsibilities and powers to any person(s) selected by it, except for grants of Awards to persons (i) who are non-employee members of the Board or otherwise are subject to Section 16 of the Exchange Act or (ii) who are or may reasonably be expected to be "covered employees" for purposes of Section 162(m) of the Code. Any such allocation or delegation may be revoked by the Committee at any time.

(c) As further set forth in Section 15(f) of the Plan, the Committee shall have the authority to amend the Plan and Awards to the extent necessary to permit participation in the Plan by Eligible Persons who are located outside of the United States on terms and conditions comparable to those afforded to Eligible Persons located within the United States; *provided, however,* that no such action shall be taken without shareholder approval if such approval is required by applicable law or regulation.

(d)  Unless otherwise expressly provided in the Plan, all designations, determinations, interpretations, and other decisions regarding the Plan or any Award or any documents evidencing Awards granted pursuant to the Plan shall be within the sole discretion of the Committee, may be made at any time and shall be final, conclusive

76

VIRTU
FINANCIAL    2020 Proxy Statement

Table of Contents

and binding upon all persons or entities, including, without limitation, the Company, any Affiliate, any Participant, any holder or beneficiary of any Award, and any shareholder of the Company.

(e)  No member of the Board, the Committee or any employee or agent of the Company (each such person, an "**_Indemnifiable Person_**") shall be liable for any action taken or omitted to be taken or any determination made with respect to the Plan or any Award hereunder (unless constituting fraud or a willful criminal act or omission). Each Indemnifiable Person shall be indemnified and held harmless by the Company against and from any loss, cost, liability, or expense (including attorneys' fees) that may be imposed upon or incurred by such Indemnifiable Person in connection with or resulting from any action, suit or proceeding to which such Indemnifiable Person may be involved as a party, witness or otherwise by reason of any action taken or omitted to be taken or determination made under the Plan or any Award agreement and against and from any and all amounts paid by such Indemnifiable Person with the Company's approval (not to be unreasonably withheld), in settlement thereof, or paid by such Indemnifiable Person in satisfaction of any judgment in any such action, suit or proceeding against such Indemnifiable Person, and the Company shall advance to such Indemnifiable Person any such expenses promptly upon written request (which request shall include an undertaking by the Indemnifiable Person to repay the amount of such advance if it shall ultimately be determined as provided below that the Indemnifiable Person is not entitled to be indemnified); _provided_, that the Company shall have the right, at its own expense, to assume and defend any such action, suit or proceeding and once the Company gives notice of its intent to assume the defense, the Company shall have sole control over such defense with counsel of recognized standing of the Company's choice. The foregoing right of indemnification shall not be available to an Indemnifiable Person to the extent that a final judgment or other final adjudication (in either case not subject to further appeal) binding upon such Indemnifiable Person determines that the acts or omissions or determinations of such Indemnifiable Person giving rise to the indemnification claim resulted from such Indemnifiable Person's fraud or willful criminal act or omission or that such right of indemnification is otherwise prohibited by law or by the Company's Certificate of Incorporation or By-laws. The foregoing right of indemnification shall not be exclusive of or otherwise supersede any other rights of indemnification to which such Indemnifiable Persons may be entitled under the Company's Certificate of Incorporation or By-laws, as a matter of law, individual indemnification agreement or contract or otherwise, or any other power that the Company may have to indemnify such Indemnifiable Persons or hold them harmless.

(f)  The Board may at any time and from time to time, grant Awards and administer the Plan with respect to such Awards. In any such case, the Board shall have all the authority granted to the Committee under the Plan.

5.  **Grant of Awards; Shares Subject to the Plan; Limitations.**

(a)  The Committee may grant Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Other Stock-Based Awards and/or Performance Compensation Awards to one or more Eligible Persons.

(b)  Subject to Section 12 of the Plan and subsection (e) below, the following limitations apply to the grant of Awards: (i) no more than 16,000,000 shares of Class A Common Stock may be delivered in the aggregate pursuant to Awards granted under the Plan; (ii) no more than 1,000,000 shares of Class A Common Stock may be subject to grants of Options or SARs under the Plan to any single Participant during any 12-month period; _provided_, _however_, that the limitation set forth in this clause (ii) shall not apply to the initial grant of Options to Vincent Viola in connection with the Company's initial public offering; (iii) no more than 16,000,000 shares of Class A Common Stock may be delivered pursuant to the exercise of Incentive Stock Options granted under the Plan; (iv) no more than 1,000,000 shares of Class A Common Stock may be delivered in respect of Performance Compensation Awards denominated in shares of Common Stock granted pursuant to Section 11 of the Plan to any Participant for a single Performance Period (or with respect to each single fiscal year in the event a Performance Period extends beyond a single fiscal year), or in the event such Performance Compensation Award is paid in cash, other securities, other Awards or other property, no more than the Fair Market Value of 1,000,000 shares of Class A Common Stock on the last day of the Performance Period to which such Award relates; (v) the maximum amount that can be paid to any individual Participant for a single fiscal year during a Performance Period (or with respect to each single year in the event a Performance Period extends beyond a single year) pursuant to a Performance Compensation Award denominated in cash described in Section 11(a) of the Plan shall be $10,000,000; and (vi) the maximum amount (based on the Fair Market Value of shares of Common Stock on the date of grant as determined in accordance with applicable financial accounting rules) of Awards that may be granted in any single fiscal year to any non-employee director shall be $300,000; _provided_, that the foregoing



limitation shall not apply in respect of any Restricted Stock Units issued to a non-employee director in lieu of payment of cash director compensation or board or committee fees or in respect of any one-time initial equity grant upon a non-employee director's appointment to the Board.

(c)  Shares of Common Stock shall be deemed to have been used in settlement of Awards whether or not they are actually delivered or the Fair Market Value equivalent of such shares is paid in cash; *provided, however,* that if shares of Common Stock issued upon exercise, vesting or settlement of an Award, or shares of Common Stock owned by the Participant are surrendered or tendered to the Company in payment of the Exercise Price or any taxes required to be withheld in respect of an Award, in each case, in accordance with the terms and conditions of the Plan and any applicable Award agreement, such surrendered or tendered shares shall again become available for other Awards; *provided, further,* that in no event shall such shares increase the number of shares of Common Stock that may be delivered pursuant to Incentive Stock Options. If and to the extent all or any portion of an Award expires, terminates or is canceled or forfeited for any reason without the Participant having received any benefit therefrom, the shares covered by such Award or portion thereof shall again become available for other Awards. For purposes of the foregoing sentence, the Participant shall not be deemed to have received any "benefit" (i) in the case of forfeited Restricted Stock by reason of having enjoyed voting rights and dividend rights prior to the date of forfeiture or (ii) in the case of an Award canceled by reason of a new Award being granted in substitution therefor.

(d)  Shares of Common Stock delivered by the Company in settlement of Awards may be authorized and unissued shares, shares held in the treasury of the Company, shares purchased on the open market or by private purchase, or a combination of the foregoing.

(e)  The Committee may grant Awards in assumption of, or in substitution for, outstanding awards previously granted by the Company or any Affiliate or an entity directly or indirectly acquired by the Company or with which the Company combines ("**Substitute Awards**"), and such Substitute Awards shall not be counted against the aggregate number of shares of Common Stock available for Awards; *provided,* that Substitute Awards issued or intended as "incentive stock options" within the meaning of Section 422 of the Code shall be counted against the aggregate number of Incentive Stock Options available under the Plan.

6.  **Eligibility.**   Participation shall be limited to Eligible Persons who have been selected by the Committee and who have entered into an Award agreement with respect to an Award granted to them under the Plan (each such Eligible Person, a "***Participant***").

7.  **Options.**

(a)  *Generally.*   Each Option shall be subject to the conditions set forth in the Plan and in the Award agreement. All Options granted under the Plan shall be Nonqualified Stock Options unless the Award agreement expressly states otherwise. Incentive Stock Options shall be granted only subject to and in compliance with Section 422 of the Code, and only to Eligible Persons who are employees of the Company and its Affiliates and who are eligible to receive an Incentive Stock Option under the Code. If for any reason an Option intended to be an Incentive Stock Option (or any portion thereof) shall not qualify as an Incentive Stock Option, then, to the extent of such nonqualification, such Option or portion thereof shall be regarded as a Nonqualified Stock Option appropriately granted under the Plan.

(b)  *Exercise Price.*   The exercise price ("***Exercise Price***") per share of Common Stock for each Option shall not be less than 100% of the Fair Market Value of such share, determined as of the date of grant. Any modification to the Exercise Price of an outstanding Option shall be subject to the prohibition on repricing set forth in Section 14(b).

(c)  *Vesting, Exercise and Expiration.*   The Committee shall determine the manner and timing of vesting, exercise and expiration of Options. The period between date of grant and the scheduled expiration date of the Option ("***Option Period***") shall not exceed ten years, unless the Option Period (other than in the case of an Incentive Stock Option) would expire at a time when trading in the shares of Common Stock is prohibited by the Company's securities trading policy or a Company-imposed "blackout period", in which case the Option Period shall be automatically extended until the 30th day following the expiration of such prohibition (so long as such extension shall not violate Section 409A of the Code). The Committee may accelerate the vesting and/or exercisability of any Option, which acceleration shall not affect any other terms and conditions of such Option.

Table of Contents

(d)  *Method of Exercise and Form of Payment.*  No shares of Common Stock shall be delivered pursuant to any exercise of an Option until the Participant has made payment in full to the Company of the Exercise Price and an amount equal to any U.S. Federal, state and local income and employment taxes and non-U.S. income and employment taxes, social contributions and any other tax-related items required to be withheld. Options may be exercised by delivery of written or electronic notice of exercise to the Company or its designee (including a third party administrator) in accordance with the terms of the Option accompanied by payment of the Exercise Price. The Exercise Price and all applicable required withholding taxes shall be payable (i) in cash, check, cash equivalent and/or shares of Common Stock valued at the Fair Market Value at the time the Option is exercised (including, pursuant to procedures approved by the Committee, by means of attestation of ownership of a sufficient number of shares of Common Stock in lieu of actual delivery of such shares to the Company); *provided*, that such shares of Common Stock are not subject to any pledge or other security interest; or (ii) by such other method as the Committee may permit, including without limitation: (A) in other property having a Fair Market Value on the date of exercise equal to the Exercise Price and all applicable required withholding taxes; (B) if there is a public market for the shares of Common Stock at such time, by means of a broker-assisted "cashless exercise" pursuant to which the Company is delivered a copy of irrevocable instructions to a stockbroker to sell the shares of Common Stock otherwise deliverable upon the exercise of the Option and to deliver promptly to the Company an amount equal to the Exercise Price and all applicable required withholding taxes; or (C) by means of a "net exercise" procedure effected by withholding the minimum number of shares of Common Stock otherwise deliverable in respect of an Option that are needed to pay for the Exercise Price and all applicable required withholding taxes. Notwithstanding the foregoing, unless otherwise determined by the Committee, if on the last day of the Option Period, the Fair Market Value exceeds the Exercise Price, the Participant has not exercised the Option, and the Option has not expired, such Option shall be deemed to have been exercised by the Participant on such last day by means of a "net exercise" procedure described above. Any fractional shares of Common Stock shall be settled in cash.

(e)  *Notification upon Disqualifying Disposition of an Incentive Stock Option.*  Each Participant awarded an Incentive Stock Option under the Plan shall notify the Company in writing immediately after the date he makes a disqualifying disposition of any Common Stock acquired pursuant to the exercise of such Incentive Stock Option. A disqualifying disposition is any disposition (including, without limitation, any sale) of such Common Stock before the later of (A) two years after the date of grant of the Incentive Stock Option or (B) one year after the date of exercise of the Incentive Stock Option. The Company may, if determined by the Committee and in accordance with procedures established by the Committee, retain possession, as agent for the applicable Participant, of any Common Stock acquired pursuant to the exercise of an Incentive Stock Option until the end of the period described in the preceding sentence, subject to complying with any instruction from such Participant as to the sale of such Common Stock.

(f)  *Compliance with Laws, etc.*  Notwithstanding the foregoing, in no event shall the Participant be permitted to exercise an Option in a manner which the Committee determines would violate the Sarbanes-Oxley Act of 2002, or any other applicable law or the applicable rules and regulations of the Securities and Exchange Commission or the applicable rules and regulations of any securities exchange or inter-dealer quotation service on which the Common Stock of the Company is listed or quoted.

(g)  *Incentive Stock Option Grants to 10% Shareholders.*  Notwithstanding anything to the contrary in this Section 7, if an Incentive Stock Option is granted to a Participant who owns stock representing more than ten percent of the voting power of all classes of stock of the Company or of a subsidiary or a parent of the Company, the Option Period shall not exceed five years from the date of grant of such Option and the Option Price shall be at least 110% of the Fair Market Value (on the date of grant) of the shares subject to the Option.

(h)  *$100,000 Per Year Limitation for Incentive Stock Options.*  To the extent the aggregate Fair Market Value (determined as of the date of grant) of shares of Common Stock for which Incentive Stock Options are exercisable for the first time by any Participant during any calendar year (under all plans of the Company) exceeds $100,000, such excess Incentive Stock Options shall be treated as Nonqualified Stock Options.



2020 Proxy Statement

Table of Contents

8.  **Stock Appreciation Rights (SARs).**

(a)  *Generally.*   Each SAR shall be subject to the conditions set forth in the Plan and the Award agreement. Any Option granted under the Plan may include a tandem SAR. The Committee also may award SARs independent of any Option.

(b)  *Strike Price.*   The strike price ("**Strike Price**") per share of Common Stock for each SAR shall not be less than 100% of the Fair Market Value of such share (determined as of the date of grant); *provided*, *however*, that a SAR granted in tandem with (or in substitution for) an Option previously granted shall have a Strike Price equal to the Exercise Price of the corresponding Option. Any modification to the Strike Price of an outstanding SAR shall be subject to the prohibition on repricing set forth in Section 14(b).

(c)  *Vesting and Expiration.*   A SAR granted in tandem with an Option shall become exercisable and shall expire according to the same vesting schedule and expiration provisions as the corresponding Option. A SAR granted independently of an Option shall vest and become exercisable and shall expire in such manner and on such date or dates determined by the Committee and shall expire after such period, not to exceed ten years, as may be determined by the Committee (the "**SAR Period**"); *provided*, *however*, that notwithstanding any vesting or exercisability dates set by the Committee, the Committee may accelerate the vesting and/or exercisability of any SAR, which acceleration shall not affect the terms and conditions of such SAR other than with respect to vesting and/or exercisability. If the SAR Period would expire at a time when trading in the shares of Common Stock is prohibited by the Company's securities trading policy or a Company-imposed "blackout period", the SAR Period shall be automatically extended until the 30th day following the expiration of such prohibition (so long as such extension shall not violate Section 409A of the Code).

(d)  *Method of Exercise.*   SARs may be exercised by delivery of written or electronic notice of exercise to the Company or its designee (including a third party administrator) in accordance with the terms of the Award, specifying the number of SARs to be exercised and the date on which such SARs were awarded. Notwithstanding the foregoing, if on the last day of the Option Period (or in the case of a SAR independent of an Option, the SAR Period), the Fair Market Value exceeds the Strike Price, the Participant has not exercised the SAR or the corresponding Option (if applicable), and neither the SAR nor the corresponding Option (if applicable) has expired, such SAR shall be deemed to have been exercised by the Participant on such last day and the Company shall make the appropriate payment therefor.

(e)  *Payment.*   Upon the exercise of a SAR, the Company shall pay to the holder thereof an amount equal to the number of shares subject to the SAR that are being exercised multiplied by the excess, if any, of the Fair Market Value of one share of Common Stock on the exercise date over the Strike Price, less an amount equal to any U.S. Federal, state and local income and employment taxes and non-U.S. income and employment taxes, social contributions and any other tax-related items required to be withheld. The Company shall pay such amount in cash, in shares of Common Stock valued at Fair Market Value, or any combination thereof, as determined by the Committee. Any fractional shares of Common Stock shall be settled in cash.

9.  **Restricted Stock and Restricted Stock Units.**

(a)  *Generally.*   Each Restricted Stock and Restricted Stock Unit grant shall be subject to the conditions set forth in the Plan and the Award agreement. The Committee shall establish restrictions applicable to such Restricted Stock and Restricted Stock Units, including the period over which the restrictions shall apply (the "**Restricted Period**"), and the time or times at which Restricted Stock or Restricted Stock Units shall become vested. The Committee may accelerate the vesting and/or the lapse of any or all of the restrictions on the Restricted Stock and Restricted Stock Units, which acceleration shall not affect any other terms and conditions of such Awards. No shares shall be issued at the time an Award of Restricted Stock Units is made, and the Company will not be required to set aside a fund for the payment of any such Award.

(b)  *Stock Certificates; Escrow or Similar Arrangement.*   Upon the grant of Restricted Stock, the Committee shall cause share(s) of Common Stock to be registered in the name of the Participant and held in book-entry form subject to the Company's directions. The Committee also may cause a stock certificate registered in the name of the Participant to be issued. In such event, the Committee may provide that such certificates shall be held by the Company or in escrow rather than delivered to the Participant pending vesting and release of restrictions, in which case the Committee may require the Participant to execute and deliver to the Company (i) an

escrow agreement satisfactory to the Committee, if applicable, and (ii) the appropriate stock power (endorsed in blank) with respect to the Restricted Stock. If the Participant shall fail to execute and deliver the escrow agreement and blank stock power within the amount of time specified by the Committee, the Award shall be null and void. Subject to the restrictions set forth in this Section 9 and the Award agreement, the Participant shall have the rights and privileges of a shareholder as to such Restricted Stock, including without limitation the right to vote such Restricted Stock.

(c)   *Restrictions; Forfeiture.*   Restricted Stock and Restricted Stock Units awarded to the Participant shall be subject to forfeiture until the expiration of the Restricted Period and the attainment of any other vesting criteria established by the Committee, and shall be subject to the restrictions on transferability set forth in the Award agreement. In the event of any forfeiture, all rights of the Participant to such Restricted Stock (or as a shareholder with respect thereto), and/or to such Restricted Stock Units, as applicable, including to any dividends and/or dividend equivalents that may have been accumulated and withheld during the Restricted Period in respect thereof, shall terminate without further action or obligation on the part of the Company. The Committee shall have the authority to remove any or all of the restrictions on the Restricted Stock and Restricted Stock Units whenever it may determine that, by reason of changes in applicable laws or other changes in circumstances arising after the date of the Restricted Stock Award or Restricted Stock Unit Award, such action is appropriate.

(d)   *Delivery of Restricted Stock and Settlement of Restricted Stock Units.*

    (i)   Upon the expiration of the Restricted Period with respect to any shares of Restricted Stock and the attainment of any other vesting criteria, the restrictions set forth in the applicable Award agreement shall be of no further force or effect, except as set forth in the Award agreement. If an escrow arrangement is used, upon such expiration the Company shall deliver to the Participant or his beneficiary (via book entry notation or, if applicable, in stock certificate form) the shares of Restricted Stock with respect to which the Restricted Period has expired (rounded down to the nearest full share). Dividends, if any, that may have been withheld by the Committee and attributable to the Restricted Stock shall be distributed to the Participant in cash or in shares of Common Stock having a Fair Market Value (on the date of distribution) equal to the amount of such dividends, upon the release of restrictions on such share.

    (ii)   Unless otherwise provided by the Committee in an Award agreement, upon the expiration of the Restricted Period and the attainment of any other vesting criteria established by the Committee, with respect to any outstanding Restricted Stock Units, the Company shall deliver to the Participant, or his beneficiary (via book entry notation or, if applicable, in stock certificate form), one share of Common Stock (or other securities or other property, as applicable) for each such outstanding Restricted Stock Unit which has not then been forfeited and with respect to which the Restricted Period has expired and any other such vesting criteria are attained ("*Released Unit*"); *provided, however,* that the Committee may elect to (i) pay cash or part cash and part Common Stock in lieu of delivering only shares of Common Stock in respect of such Released Units or (ii) defer the delivery of Common Stock (or cash or part Common Stock and part cash, as the case may be) beyond the expiration of the Restricted Period if such extension would not cause adverse tax consequences under Section 409A of the Code. If a cash payment is made in lieu of delivering shares of Common Stock, the amount of such payment shall be equal to the Fair Market Value of the Common Stock as of the date on which the Restricted Period lapsed with respect to such Restricted Stock Units. To the extent provided in an Award agreement, the holder of outstanding Restricted Stock Units shall be entitled to be credited with dividend equivalent payments (upon the payment by the Company of dividends on shares of Common Stock) either in cash or, if determined by the Committee, in shares of Common Stock having a Fair Market Value equal to the amount of such dividends (and interest may, if determined by the Committee, be credited on the amount of cash dividend equivalents at a rate and subject to such terms as determined by the Committee), which accumulated dividend equivalents (and interest thereon, if applicable) shall be payable at the same time as the underlying Restricted Stock Units are settled following the release of restrictions on such Restricted Stock Units, and, if such Restricted Stock Units are forfeited, the holder thereof shall have no right to such dividend equivalent payments.

(e)   *Legends on Restricted Stock.*   Each certificate representing Restricted Stock awarded under the Plan, if any, shall bear a legend substantially in the form of the following in addition to any other information the Company deems appropriate until the lapse of all restrictions with respect to such Common Stock:



TRANSFER OF THIS CERTIFICATE AND THE SHARES REPRESENTED HEREBY IS RESTRICTED PURSUANT TO THE TERMS OF THE VIRTU FINANCIAL, INC.AMENDED AND RESTATED 2015 MANAGEMENT INCENTIVE PLAN AND A RESTRICTED STOCK AWARD AGREEMENT, DATED AS OF _____ , BETWEEN VIRTU FINANCIAL, INC. AND . A COPY OF SUCH PLAN AND AWARD AGREEMENT IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICES OF VIRTU FINANCIAL, INC.

10.    **Other Stock-Based Awards.**  The Committee may issue unrestricted Common Stock, rights to receive future grants of Awards, or other Awards denominated in Common Stock (including performance shares or performance units), or Awards that provide for cash payments based in whole or in part on the value or future value of shares of Common Stock under the Plan to Eligible Persons, alone or in tandem with other Awards, in such amounts as the Committee shall from time to time determine ("*Other Stock-Based Awards*"). Each Other Stock-Based Award shall be evidenced by an Award agreement which may include conditions including without limitation the payment by the Participant of the Fair Market Value of such shares of Common Stock on the date of grant.

11.    **Performance Compensation Awards.**

(a)    *Generally.*    The Committee shall have the authority, at or before the time of grant of any Award described in Sections 7 through 10 of the Plan, to designate such Award as a Performance Compensation Award intended to qualify as "performance-based compensation" under Section 162(m) of the Code. In addition, the Committee shall have the authority to make an award of a cash bonus to any Participant and designate such Award as a Performance Compensation Award intended to qualify as "performance based compensation" under Section 162(m). Notwithstanding the foregoing, (i) any Award to a Participant who is a "covered employee" within the meaning of Section 162(m) for a fiscal year that satisfies the requirements of this Section 11 may be treated as a Performance Compensation Award in the absence of any such Committee designation and (ii) if the Company determines that a Participant who has been granted an Award designated as a Performance Compensation Award is not (or is no longer) a "covered employee" within the meaning of Section 162(m), the terms and conditions of such Award may be modified without regard to any restrictions or limitations set forth in this Section 11 (but subject otherwise to the provisions of Section 14 of the Plan).

(b)    *Discretion of Committee with Respect to Performance Compensation Awards.*    The Committee may select the length of a Performance Period, the type(s) of Performance Compensation Awards to be issued, the Performance Criteria used to establish the Performance Goal(s), the kind(s) and/or level(s) of the Performance Goals(s) and the Performance Formula. Within the first 90 days of a Performance Period (or the maximum period allowed under Section 162(m) of the Code), the Committee shall, with regard to the Performance Compensation Awards to be issued for such Performance Period, exercise its discretion with respect to each of the matters enumerated in the immediately preceding sentence and record the same in writing (which may be in the form of minutes of a meeting of the Committee).

(c)    *Performance Criteria.*    The Performance Criteria that will be used to establish the Performance Goal(s) may be based on the attainment of specific levels of performance of the Company (and/or one or more Affiliates, divisions or operational and/or business units, product lines, brands, business segments, administrative departments, units, or any combination of the foregoing) and shall be limited to the following: (i) net earnings or net income (before or after taxes); (ii) basic or diluted earnings per share (before or after taxes); (iii) net revenue or net revenue growth; (iv) gross revenue or gross revenue growth, gross profit or gross profit growth; (v) net operating profit (before or after taxes); (vi) return measures (including, but not limited to, return on investment, assets, capital, gross revenue or gross revenue growth, invested capital, equity or sales); (vii) cash flow measures (including, but not limited to, operating cash flow, free cash flow and cash flow return on capital), which may but are not required to be measured on a per-share basis; (viii) earnings before or after taxes, interest, depreciation, and amortization (including EBIT and EBITDA); (ix) gross or net operating margins; (x) productivity ratios; (xi) share price (including, but not limited to, growth measures and total shareholder return); (xii) expense targets or cost reduction goals, general and administrative expense savings; (xiii) operating efficiency; (xiv) objective measures of customer satisfaction; (xv) working capital targets; (xvi) measures of economic value added or other "value creation" metrics; (xvii) enterprise value; (xviii) stockholder return; (xix) client retention; (xx) competitive market metrics; (xxi) employee retention; (xxii) objective measures of personal targets, goals or completion of projects (including but not limited to succession and hiring projects, completion of specific acquisitions, reorganizations or other corporate transactions or capital-raising transactions, expansions of specific business operations and meeting

Table of Contents

divisional or project budgets); (xxiii) system-wide revenues; (xxiv) cost of capital, debt leverage year-end cash position or book value; (xxv) strategic objectives, development of new product lines and related revenue, sales and margin targets, or international operations; or (xxvi) any combination of the foregoing. Any one or more of the Performance Criteria may be stated as a percentage of another Performance Criteria, or a percentage of a prior period's Performance Criteria, or used on an absolute, relative or adjusted basis to measure the performance of the Company and/or one or more Affiliates as a whole or any divisions or operational and/or business units, product lines, brands, business segments, administrative departments of the Company and/or one or more Affiliates or any combination thereof, as the Committee may deem appropriate, or any of the above Performance Criteria may be compared to the performance of a group of comparator companies, or a published or special index that the Committee deems appropriate, or as compared to various stock market indices. The Committee also has the authority to provide for accelerated vesting, delivery and exercisability of any Award based on the achievement of Performance Goals pursuant to the Performance Criteria specified in this paragraph. To the extent required under Section 162(m) of the Code, the Committee shall, within the first 90 days of a Performance Period (or within the maximum period allowed under Section 162(m) of the Code), define in an objective fashion the manner of calculating the Performance Criteria it selects to use for such Performance Period.

(d)    *Modification of Performance Goal(s).*    The Committee may alter Performance Criteria without obtaining shareholder approval if applicable tax and/or securities laws so permit. The Committee may modify the calculation of a Performance Goal during the first 90 days of a Performance Period (or within the maximum period allowed under Section 162(m) of the Code), or at any time thereafter if the change would not cause any Performance Compensation Award to fail to qualify as "performance-based compensation" under Section 162(m), to reflect any of the following events: (i) asset write-downs; (ii) litigation or claim judgments or settlements; (iii) the effect of changes in tax laws, accounting principles, or other laws or regulatory rules affecting reported results; (iv) any reorganization and restructuring programs; (v) extraordinary nonrecurring items as described in Accounting Standards Codification Topic 225-20 (or any successor pronouncement thereto) and/or in management's discussion and analysis of financial condition and results of operations appearing in the Company's annual report to shareholders for the applicable year; (vi) acquisitions or divestitures; (vii) any other specific unusual or nonrecurring events, or objectively determinable category thereof; (viii) foreign exchange gains and losses; (ix) discontinued operations and nonrecurring charges; and (x) a change in the Company's fiscal year.

(e)    *Payment of Performance Compensation Awards.*

(i)    *Condition to Receipt of Payment.*    Unless otherwise provided in the applicable Award agreement or any employment, consulting, change-in-control, severance or other agreement between the Participant and the Company or an Affiliate, the Participant must be employed by or rendering services for the Company or an Affiliate on the last day of a Performance Period to be eligible for payment in respect of a Performance Compensation Award for such Performance Period.

(ii)    *Limitation.*    Unless otherwise provided in the applicable Award agreement, or any employment, consulting, change-in-control, severance or other agreement between the Participant and the Company or an Affiliate, the Participant shall be eligible to receive payment or delivery, as applicable, in respect of a Performance Compensation Award only to the extent the Committee determines that: (A) the Performance Goals for such period are achieved, as determined by the Committee; and (B) all or some of the portion of such Participant's Performance Compensation Award has been earned for the Performance Period based on the application of the Performance Formula to such achieved Performance Goals, as determined by the Committee; *provided, however,* that if so provided by the Committee in its sole discretion, in the event of (x) the termination of the Participant's employment or service by the Company other than for Cause (and other than due to death or Disability), in each case within 12 months following a Change in Control, or (y) the termination of a Participant's employment or service due to the Participant's death or Disability, the Participant shall receive payment in respect of a Performance Compensation Award based on (1) actual performance through the date of termination as determined by the Committee, or (2) if the Committee determines that measurement of actual performance cannot be reasonably assessed, the assumed achievement of target performance as determined by the Committee (but not to the extent that application of this clause (2) would cause Section 162(m) of the Code to result in the loss of the deduction of the compensation payable in respect of such Performance Compensation Award for any Participant reasonably expected to be a "covered



employee" within the meaning of Section 162(m) of the Code, in each case prorated based on the time elapsed from the date of grant to the date of termination of employment or service.

(iii)   *Certification.*   Following the completion of a Performance Period, the Committee shall review and certify in writing (which may be in the form of minutes of a meeting of the Committee) whether, and to what extent, the Performance Goals for the Performance Period have been achieved and, if so, calculate and certify in writing (which may be in the form of minutes of a meeting of the Committee) that amount of the Performance Compensation Awards earned for the period based upon the Performance Formula. The Committee shall then determine the amount of each Participant's Performance Compensation Award actually payable for the Performance Period and, in so doing, may apply discretion to eliminate or reduce the size of a Performance Compensation Award consistent with Section 162(m) of the Code. Unless otherwise provided in the applicable Award agreement, the Committee shall not have the discretion to (A) provide payment or delivery in respect of Performance Compensation Awards for a Performance Period if the Performance Goals for such Performance Period have not been attained; or (B) increase a Performance Compensation Award above the applicable limitations set forth in Section 5 of the Plan.

(f)   *Timing of Award Payments.*   Unless otherwise provided in the applicable Award agreement, Performance Compensation Awards granted for a Performance Period shall be paid to Participants as soon as administratively practicable following completion of the certifications required by this Section 11. Any Performance Compensation Award that has been deferred shall not (between the date as of which the Award is deferred and the payment date) increase (i) with respect to a Performance Compensation Award that is payable in cash, by a measuring factor for each fiscal year greater than a reasonable rate of interest set by the Committee or (ii) with respect to a Performance Compensation Award that is payable in shares of Common Stock, by an amount greater than the appreciation of a share of Common Stock from the date such Award is deferred to the payment date. Unless otherwise provided in an Award agreement, any Performance Compensation Award that is deferred and is otherwise payable in shares of Common Stock shall be credited (during the period between the date as of which the Award is deferred and the payment date) with dividend equivalents (in a manner consistent with the methodology set forth in the last sentence of Section 9(d)(ii)).

12.   **Changes in Capital Structure and Similar Events.**   In the event of (a) any dividend (other than regular cash dividends) or other distribution (whether in the form of cash, shares of Common Stock, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, split-off, spin-off, combination, repurchase or exchange of shares of Common Stock or other securities of the Company, issuance of warrants or other rights to acquire shares of Common Stock or other securities of the Company, or other similar corporate transaction or event (including, without limitation, a Change in Control) that affects the shares of Common Stock, or (b) unusual or nonrecurring events (including, without limitation, a Change in Control) affecting the Company, any Affiliate, or the financial statements of the Company or any Affiliate, or changes in applicable rules, rulings, regulations or other requirements of any governmental body or securities exchange or inter-dealer quotation service, accounting principles or law, such that in any case an adjustment is determined by the Committee to be necessary or appropriate, then the Committee shall make any such adjustments in such manner as it may deem equitable, including without limitation any or all of the following: (i) adjusting any or all of (A) the number of shares of Common Stock or other securities of the Company (or number and kind of other securities or other property) which may be delivered in respect of Awards or with respect to which Awards may be granted under the Plan (including, without limitation, adjusting any or all of the limitations under Section 5 of the Plan) and (B) the terms of any outstanding Award, including, without limitation, (1) the number of shares of Common Stock or other securities of the Company (or number and kind of other securities or other property) subject to outstanding Awards or to which outstanding Awards relate, (2) the Exercise Price or Strike Price with respect to any Award or (3) any applicable performance measures (including, without limitation, Performance Criteria, Performance Formula and Performance Goals); (ii) providing for a substitution or assumption of Awards (or awards of an acquiring company), accelerating the delivery, vesting and/or exercisability of, lapse of restrictions and/or other conditions on, or termination of, Awards or providing for a period of time (which shall not be required to be more than ten (10) days) for Participants to exercise outstanding Awards prior to the occurrence of such event (and any such Award not so exercised shall terminate upon the occurrence of such event); and (iii) cancelling any one or more outstanding Awards (or awards of an acquiring company) and causing to be paid to the holders thereof, in cash, shares of Common Stock, other securities or other property, or any combination

VIRTU FINANCIAL    2020 Proxy Statement

Table of Contents

thereof, the value of such Awards, if any, as determined by the Committee (which if applicable may be based upon the price per share of Common Stock received or to be received by other shareholders of the Company in such event), including without limitation, in the case of an outstanding Option or SAR, a cash payment in an amount equal to the excess, if any, of the Fair Market Value (as of a date specified by the Committee) of the shares of Common Stock subject to such Option or SAR over the aggregate Exercise Price or Strike Price of such Option or SAR, respectively (it being understood that, in such event, any Option or SAR having a per share Exercise Price or Strike Price equal to, or in excess of, the Fair Market Value of a share of Common Stock subject thereto may be canceled and terminated without any payment or consideration therefor); *provided*, *however*, that the Committee shall make an equitable or proportionate adjustment to outstanding Awards to reflect any "equity restructuring" (within the meaning of the Financial Accounting Standards Codification Topic 718 (or any successor pronouncement thereto)). Except as otherwise determined by the Committee, any adjustment in Incentive Stock Options under this Section 12 (other than any cancellation of Incentive Stock Options) shall be made only to the extent not constituting a "modification" within the meaning of Section 424(h)(3) of the Code, and any adjustments under this Section 12 shall be made in a manner which does not adversely affect the exemption provided pursuant to Rule 16b-3 promulgated under the Exchange Act. The Company shall give each Participant notice of an adjustment hereunder and, upon notice, such adjustment shall be conclusive and binding for all purposes.

13.   **Effect of Change in Control.**   Except to the extent otherwise provided in an Award agreement, or any applicable employment, consulting, change-in-control, severance or other agreement between the Participant and the Company or an Affiliate, in the event of a Change in Control, notwithstanding any provision of the Plan to the contrary:

(a)   In the event the Participant's employment with the Company or an Affiliate is terminated by the Company or Affiliate without Cause (and other than due to death or Disability) on or within 12 months following a Change in Control, the Committee may provide that all Options and SARs held by such Participant shall become immediately exercisable with respect to 100% of the shares subject to such Options and SARs, and that the Restricted Period (and any other conditions) shall expire immediately with respect to 100% of the shares of Restricted Stock and Restricted Stock Units and any other Awards held by such Participant (including a waiver of any applicable Performance Goals); *provided*, that in the event the vesting or exercisability of any Award would otherwise be subject to the achievement of performance conditions, the portion of such Award that shall become fully vested and immediately exercisable shall be based on the assumed achievement of target performance as determined by the Committee and prorated for the number of days elapsed from the grant date of such Award through the date of termination.

(b)   In addition, the Committee may upon at least ten (10) days' advance notice to the affected persons, cancel any outstanding Award and pay to the holders thereof, in cash, securities or other property (including of the acquiring or successor company), or any combination thereof, the value of such Awards based upon the price per share of Common Stock received or to be received by other shareholders of the Company in the event. Notwithstanding the above, the Committee shall exercise such discretion over any Award subject to Code Section 409A at the time such Award is granted.

To the extent practicable, the provisions of this Section 13 shall occur in a manner and at a time which allows affected Participants the ability to participate in the Change in Control transaction with respect to the Common Stock subject to their Awards.

14.   **Amendments and Termination.**

(a)   *Amendment and Termination of the Plan.*   The Board may amend, alter, suspend, discontinue, or terminate the Plan or any portion thereof at any time; *provided*, that no such amendment, alteration, suspension, discontinuation or termination shall be made without shareholder approval if such approval is necessary to comply with any tax or regulatory requirement applicable to the Plan (including, without limitation, as necessary to comply with any rules or requirements of any securities exchange or inter-dealer quotation service on which the shares of Common Stock may be listed or quoted, for changes in GAAP to new accounting standards, or to prevent the Company from being denied a tax deduction under Section 162(m) of the Code); *provided*, *further*, that any such amendment, alteration, suspension, discontinuance or termination that would materially and adversely affect the rights of any Participant or any holder or beneficiary of any Award theretofore granted shall not to that extent be effective without the consent of the affected Participant, holder or beneficiary, unless the Committee determines



Table of Contents

that such amendment, alteration, suspension, discontinuance or termination either is required or advisable in order for the Company, the Plan or the Award to satisfy any applicable law or regulation. Notwithstanding the foregoing, no amendment shall be made to the last proviso of Section 14(b) without shareholder approval.

    (b)   *Amendment of Award Agreements.*   The Committee may, to the extent not inconsistent with the terms of any applicable Award agreement, waive any conditions or rights under, amend any terms of, or alter, suspend, discontinue, cancel or terminate, any Award theretofore granted or the associated Award agreement, prospectively or retroactively (including after the Participant's termination of employment or service with the Company); *provided*, that any such waiver, amendment, alteration, suspension, discontinuance, cancellation or termination that would materially and adversely affect the rights of any Participant with respect to any Award theretofore granted shall not to that extent be effective without the consent of the affected Participant unless the Committee determines that such waiver, amendment, alteration, suspension, discontinuance, cancellation or termination either is required or advisable in order for the Company, the Plan or the Award to satisfy any applicable law or regulation; *provided*, *further*, that except as otherwise permitted under Section 12 of the Plan, if (i) the Committee reduces the Exercise Price of any Option or the Strike Price of any SAR, (ii) the Committee cancels any outstanding Option or SAR and replaces it with a new Option or SAR (with a lower Exercise Price or Strike Price, as the case may be) or other Award or cash in a manner which would either (A) be reportable on the Company's proxy statement or Form 10-K (if applicable) as Options which have been "repriced" (as such term is used in Item 402 of Regulation S-K promulgated under the Exchange Act), or (B) result in any "repricing" for financial statement reporting purposes (or otherwise cause the Award to fail to qualify for equity accounting treatment) or (iii) the Committee takes any other action which is considered a "repricing" for purposes of the shareholder approval rules of the applicable securities exchange or inter-dealer quotation service on which the Common Stock is listed or quoted, then, in the case of the immediately preceding clauses (i) through (iii), any such action shall not be effective without shareholder approval.

15.   **General.**

    (a)   *Award Agreements; Other Agreements.*   Each Award under the Plan shall be evidenced by an Award agreement, which shall be delivered to the Participant and shall specify the terms and conditions of the Award and any rules applicable thereto. An Award agreement may be in written or electronic form and shall be signed (either in written or electronic form) by the Participant and a duly authorized representative of the Company. The terms of any Award agreement, or any employment, change-in-control, severance or other agreement in effect with the Participant, may have terms or features different from and/or additional to those set forth in the Plan, and, unless expressly provided otherwise in such Award or other agreement, shall control in the event of any conflict with the terms of the Plan.

    (b)   *Nontransferability.*

      (i)  Each Award shall be exercisable only by the Participant during the Participant's lifetime, or, if permissible under applicable law, by the Participant's legal guardian or representative. No Award may be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by the Participant other than by will or by the laws of descent and distribution and any such purported assignment, alienation, pledge, attachment, sale, transfer or encumbrance shall be void and unenforceable against the Company or an Affiliate; *provided*, that the designation of a beneficiary shall not constitute an assignment, alienation, pledge, attachment, sale, transfer or encumbrance.

      (ii)  Notwithstanding the foregoing, the Committee may permit Awards (other than Incentive Stock Options) to be transferred by the Participant, without consideration, subject to such rules as the Committee may adopt, to: (A) any person who is a "family member" of the Participant, as such term is used in the instructions to Form S-8 under the Securities Act or any successor form of registration statements promulgated by the Securities and Exchange Commission (collectively, the "**Immediate Family Members**"); (B) a trust solely for the benefit of the Participant and his Immediate Family Members; (C) a partnership or limited liability company whose only partners or shareholders are the Participant and his Immediate Family Members; or (D) any other transferee as may be approved either (1) by the Board or the Committee, or (2) as provided in the applicable Award agreement; (each transferee described in clauses (A), (B), (C) and (D) above is hereinafter referred to as a "**Permitted Transferee**"); *provided*, that the Participant gives the Committee advance written notice describing the terms and conditions of the proposed transfer and the

Committee notifies the Participant in writing that such a transfer would comply with the requirements of the Plan.

(iii)   The terms of any Award transferred in accordance with the immediately preceding sentence shall apply to the Permitted Transferee and any reference in the Plan, or in any applicable Award agreement, to the Participant shall be deemed to refer to the Permitted Transferee, except that (A) Permitted Transferees shall not be entitled to transfer any Award, other than by will or the laws of descent and distribution; (B) Permitted Transferees shall not be entitled to exercise any transferred Option unless there shall be in effect a registration statement on an appropriate form covering the shares of Common Stock to be acquired pursuant to the exercise of such Option if the Committee determines, consistent with any applicable Award agreement, that such a registration statement is necessary or appropriate; (C) the Committee or the Company shall not be required to provide any notice to a Permitted Transferee, whether or not such notice is or would otherwise have been required to be given to the Participant under the Plan or otherwise; and (D) the consequences of the termination of the Participant's employment by, or services to, the Company or an Affiliate under the terms of the Plan and the applicable Award agreement shall continue to be applied with respect to the transferred Award, including, without limitation, that an Option shall be exercisable by the Permitted Transferee only to the extent, and for the periods, specified in the Plan and the applicable Award agreement.

(c)   *Dividends and Dividend Equivalents.*   The Committee may provide the Participant as part of an Award with dividends or dividend equivalents, payable in cash, shares of Common Stock, other securities, other Awards or other property, on a current or deferred basis, on such terms and conditions as may be determined by the Committee, including, without limitation, payment directly to the Participant, withholding of such amounts by the Company subject to vesting of the Award or reinvestment in additional shares of Common Stock, Restricted Stock or other Awards; *provided*, that no dividends or dividend equivalents shall be payable in respect of outstanding (i) Options or SARs or (ii) unearned Performance Compensation Awards or other unearned Awards subject to performance conditions (other than or in addition to the passage of time); *provided, further*, that dividend equivalents may be accumulated in respect of unearned Awards and paid as soon as administratively practicable, but no more than 60 days, after such Awards are earned and become payable or distributable (and the right to any such accumulated dividends or dividend equivalents shall be forfeited upon the forfeiture of the Award to which such dividends or dividend equivalents relate).

(d)   *Tax Withholding.*

(i)   The Participant shall be required to pay to the Company or any Affiliate, and the Company or any Affiliate shall have the right (but not the obligation) and is hereby authorized to withhold, from any cash, shares of Common Stock, other securities or other property deliverable under any Award or from any compensation or other amounts owing to the Participant, the amount (in cash, Common Stock, other securities or other property) of any required withholding taxes in respect of an Award, its exercise, or any payment or transfer under an Award or under the Plan and to take such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes.

(ii)   Without limiting the generality of clause (i) above, the Committee may permit the Participant to satisfy, in whole or in part, the foregoing withholding liability by (A) payment in cash; (B) the delivery of shares of Common Stock (which are not subject to any pledge or other security interest) owned by the Participant having a Fair Market Value equal to such withholding liability or (C) having the Company withhold from the number of shares of Common Stock otherwise issuable or deliverable pursuant to the exercise or settlement of the Award a number of shares with a Fair Market Value equal to such withholding liability.

(e)   *No Claim to Awards; No Rights to Continued Employment.*   No employee of the Company or an Affiliate, or other person, shall have any claim or right to be granted an Award under the Plan or, having been selected for the grant of an Award, to be selected for a grant of any other Award. There is no obligation for uniformity of treatment of Participants or holders or beneficiaries of Awards. The terms and conditions of Awards and the Committee's determinations and interpretations with respect thereto need not be the same with respect to each Participant and may be made selectively among Participants, whether or not such Participants are similarly situated. Neither the Plan nor any action taken hereunder shall be construed as giving any Participant any right to



2020 Proxy Statement

Table of Contents

be retained in the employ or service of the Company or an Affiliate, nor shall it be construed as giving any Participant any rights to continued service on the Board.

(f) *International Participants.* With respect to Participants who reside or work outside the United States and who are not (and who are not expected to be) "covered employees" within the meaning of Section 162(m) of the Code, the Committee may amend the terms of the Plan or appendices thereto, or outstanding Awards, with respect to such Participants, in order to conform such terms with or accommodate the requirements of local laws, procedures or practices or to obtain more favorable tax or other treatment for the Participant, the Company or its Affiliates. Without limiting the generality of this subsection, the Committee is specifically authorized to adopt rules, procedures and sub-plans with provisions that limit or modify rights on death, disability, retirement or other terminations of employment, available methods of exercise or settlement of an Award, payment of income, social insurance contributions or payroll taxes, withholding procedures and handling of any stock certificates or other indicia of ownership which vary with local requirements. The Committee may also adopt rules, procedures or sub-plans applicable to particular Affiliates or locations.

(g) *Beneficiary Designation.* The Participant's beneficiary shall be deemed to be his spouse (or domestic partner if such status is recognized by the Company and in such jurisdiction), or if the Participant is otherwise unmarried at the time of death, his estate, except to the extent a different beneficiary is designated in accordance with procedures that may be established by the Committee from time to time for such purpose. Notwithstanding the foregoing, in the absence of a beneficiary validly designated under such Committee-established procedures and/or applicable law who is living (or in existence) at the time of death of a Participant residing or working outside the United States, any required distribution under the Plan shall be made to the executor or administrator of the estate of the Participant, or to such other individual as may be prescribed by applicable law.

(h) *Termination of Employment or Service.* Except as otherwise provided in an Award agreement, or any employment, consulting, change-in-control, severance or other agreement between the Participant and the Company or an Affiliate, unless determined otherwise by the Committee: (i) neither a temporary absence from employment or service due to illness, vacation or leave of absence (including, without limitation, a call to active duty for military service through a Reserve or National guard unit) nor a transfer from employment or service with the Company to employment or service with an Affiliate (or vice versa) shall be considered a termination of employment or service with the Company or an Affiliate; and (ii) if the Participant's employment with the Company or its Affiliates terminates, but such Participant continues to provide services with the Company or its Affiliates in a non-employee capacity (including as a Non-Employee Director) (or vice versa), such change in status shall not be considered a termination of employment or service with the Company or an Affiliate for purposes of the Plan.

(i) *No Rights as a Shareholder.* Except as otherwise specifically provided in the Plan or any Award agreement, no person shall be entitled to the privileges of ownership in respect of shares of Common Stock which are subject to Awards hereunder until such shares have been issued or delivered to that person.

(j) *Government and Other Regulations.*

(i) Nothing in the Plan shall be deemed to authorize the Committee or Board or any members thereof to take any action contrary to applicable law or regulation, or rules of NASDAQ or any other securities exchange or inter-dealer quotation service on which the Common Stock is listed or quoted.

(ii) The obligation of the Company to settle Awards in Common Stock or other consideration shall be subject to all applicable laws, rules, and regulations, and to such approvals by governmental agencies as may be required. Notwithstanding any terms or conditions of any Award to the contrary, the Company shall be under no obligation to offer to sell or to sell, and shall be prohibited from offering to sell or selling, any shares of Common Stock pursuant to an Award unless such shares have been properly registered for sale pursuant to the Securities Act with the Securities and Exchange Commission or unless the Company has received an opinion of counsel, satisfactory to the Company, that such shares may be offered or sold without such registration pursuant to and in compliance with the terms of an available exemption. The Company shall be under no obligation to register for sale under the Securities Act any of the shares of Common Stock to be offered or sold under the Plan. The Committee shall have the authority to provide that all shares of Common Stock or other securities of the Company or any Affiliate delivered under the Plan shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the Plan, the

applicable Award agreement, the U.S. Federal securities laws, or the rules, regulations and other requirements of the U.S. Securities and Exchange Commission, any securities exchange or inter-dealer quotation service upon which such shares or other securities of the Company are then listed or quoted and any other applicable Federal, state, local or non-U.S. laws, rules, regulations and other requirements, and, without limiting the generality of Section 9 of the Plan, the Committee may cause a legend or legends to be put on any such certificates of Common Stock or other securities of the Company or any Affiliate delivered under the Plan to make appropriate reference to such restrictions or may cause such Common Stock or other securities of the Company or any Affiliate delivered under the Plan in book-entry form to be held subject to the Company's instructions or subject to appropriate stop-transfer orders. Notwithstanding any provision in the Plan to the contrary, the Committee reserves the right to add any additional terms or provisions to any Award granted under the Plan that it in its sole discretion deems necessary or advisable in order that such Award complies with the legal requirements of any governmental entity to whose jurisdiction the Award is subject.

(iii)  The Committee may cancel an Award or any portion thereof if it determines that legal or contractual restrictions and/or blockage and/or other market considerations would make the Company's acquisition of shares of Common Stock from the public markets, the Company's issuance of Common Stock to the Participant, the Participant's acquisition of Common Stock from the Company and/or the Participant's sale of Common Stock to the public markets, illegal, impracticable or inadvisable. If the Committee determines to cancel all or any portion of an Award in accordance with the foregoing, unless prevented by applicable laws, the Company shall pay to the Participant an amount equal to the excess of (A) the aggregate Fair Market Value of the shares of Common Stock subject to such Award or portion thereof canceled (determined as of the applicable exercise date, or the date that the shares would have been vested or delivered, as applicable), over (B) the aggregate Exercise Price or Strike Price (in the case of an Option or SAR, respectively) or any amount payable as a condition of delivery of shares of Common Stock (in the case of any other Award). Such amount shall be delivered to the Participant as soon as practicable following the cancellation of such Award or portion thereof.

(k)   *No Section 83(b) Elections Without Consent of Company.*   No election under Section 83(b) of the Code or under a similar provision of law may be made unless expressly permitted by the terms of the applicable Award agreement or by action of the Committee in writing prior to the making of such election. If the Participant, in connection with the acquisition of shares of Common Stock under the Plan or otherwise, is expressly permitted to make such election and the Participant makes the election, the Participant shall notify the Company of such election within ten days of filing notice of the election with the Internal Revenue Service or other governmental authority, in addition to any filing and notification required pursuant to Section 83(b) of the Code or other applicable provision.

(l)   *Payments to Persons Other Than Participants.*   If the Committee shall find that any person to whom any amount is payable under the Plan is unable to care for his affairs because of illness or accident, or is a minor, or has died, then any payment due to such person or his estate (unless a prior claim therefor has been made by a duly appointed legal representative or a beneficiary designation form has been filed with the Company) may, if the Committee so directs the Company, be paid to his spouse, child, relative, an institution maintaining or having custody of such person, or any other person deemed by the Committee to be a proper recipient on behalf of such person otherwise entitled to payment. Any such payment shall be a complete discharge of the liability of the Committee and the Company therefor.

(m)   *Nonexclusivity of the Plan.*   Neither the adoption of the Plan by the Board nor the submission of the Plan to the shareholders of the Company for approval shall be construed as creating any limitations on the power of the Board to adopt such other incentive arrangements as it may deem desirable, including, without limitation, the granting of stock options otherwise than under the Plan, and such arrangements may be either applicable generally or only in specific cases.

(n)   *No Trust or Fund Created.*   Neither the Plan nor any Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate, on the one hand, and the Participant or other person or entity, on the other hand. No provision of the Plan or any Award shall require the Company, for the purpose of satisfying any obligations under the Plan, to purchase assets or place any assets in a trust or other entity to which contributions are made or otherwise to segregate any assets, nor shall the



2020 Proxy Statement

Company maintain separate bank accounts, books, records or other evidence of the existence of a segregated or separately maintained or administered fund for such purposes. Participants shall have no rights under the Plan other than as unsecured general creditors of the Company.

(o)    *Reliance on Reports.*    Each member of the Committee and each member of the Board (and their respective designees) shall be fully justified in acting or failing to act, as the case may be, and shall not be liable for having so acted or failed to act in good faith, in reliance upon any report made by the independent registered public accounting firm of the Company and its Affiliates and/or any other information furnished in connection with the Plan by any agent of the Company or the Committee or the Board, other than himself.

(p)    *Relationship to Other Benefits.*    No payment under the Plan shall be taken into account in determining any benefits under any pension, retirement, profit sharing, group insurance or other benefit plan of the Company except as otherwise specifically provided in such other plan.

(q)    *Purchase for Investment.*    Whether or not the Options and shares covered by the Plan have been registered under the Securities Act, each person exercising an Option under the Plan or acquiring shares under the Plan, may be required by the Company to give a representation in writing that such person is acquiring such shares for investment and not with a view to, or for sale in connection with, the distribution of any part thereof. The Company will endorse any necessary legend referring to the foregoing restriction upon the certificate or certificates representing any shares issued or transferred to the Participant upon the exercise of any Option granted under the Plan.

(r)    *Governing Law.*    The Plan shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware.

(s)    *Severability.*    If any provision of the Plan or any Award or Award agreement is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction or as to any person or entity or Award, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended to conform to the applicable laws, or if it cannot be construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Plan or the Award, such provision shall be construed or deemed stricken as to such jurisdiction, person or entity or Award and the remainder of the Plan and any such Award shall remain in full force and effect.

(t)    *Obligations Binding on Successors.*    The obligations of the Company under the Plan shall be binding upon any successor corporation or organization resulting from the merger, consolidation or other reorganization of the Company, or upon any successor corporation or organization succeeding to all or substantially all of the assets and business of the Company.

(u)    *409A of the Code.*

(i)    It is intended that the Plan comply with Section 409A of the Code, and all provisions of the Plan shall be construed and interpreted in a manner consistent with the requirements for avoiding taxes or penalties under Section 409A of the Code. Each Participant is solely responsible and liable for the satisfaction of all taxes and penalties that may be imposed on or in respect of such Participant in connection with the Plan or any other plan maintained by the Company, including any taxes and penalties under Section 409A of the Code, and neither the Company nor any Affiliate shall have any obligation to indemnify or otherwise hold such Participant or any beneficiary harmless from any or all of such taxes or penalties. With respect to any Award that is considered "deferred compensation" subject to Section 409A of the Code, references in the Plan to "termination of employment" (and substantially similar phrases) shall mean "separation from service" within the meaning of Section 409A of the Code. For purposes of Section 409A of the Code, each of the payments that may be made in respect of any Award granted under the Plan is designated as a separate payment.

(ii)    Notwithstanding anything in the Plan to the contrary, if the Participant is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code, no payments or deliveries in respect of any Awards that are "deferred compensation" subject to Section 409A of the Code shall be made to such Participant prior to the date that is six months after the date of such Participant's "separation from service"

VIRTU FINANCIAL    2020 Proxy Statement

within the meaning of Section 409A of the Code or, if earlier, the Participant's date of death. All such delayed payments or deliveries will be paid or delivered (without interest) in a single lump sum on the earliest date permitted under Section 409A of the Code that is also a business day.

(iii)  In the event that the timing of payments in respect of any Award that would otherwise be considered "deferred compensation" subject to Section 409A of the Code would be accelerated upon the occurrence of (A) a Change in Control, no such acceleration shall be permitted unless the event giving rise to the Change in Control satisfies the definition of a change in the ownership or effective control of a corporation, or a change in the ownership of a substantial portion of the assets of a corporation pursuant to Section 409A of the Code and any Treasury Regulations promulgated thereunder or (B) a Disability, no such acceleration shall be permitted unless the Disability also satisfies the definition of "Disability" pursuant to Section 409A of the Code and any Treasury Regulations promulgated thereunder.

(v)  *Clawback/Forfeiture.*   Notwithstanding anything to the contrary contained herein, an Award agreement may provide that the Committee may cancel such Award if the Participant, without the consent of the Company, has engaged in or engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate while employed by or providing services to the Company or any Affiliate, including fraud or conduct contributing to any financial restatements or irregularities, or violates a non-competition, non-solicitation, non-disparagement or non-disclosure covenant or agreement with the Company or any Affiliate, as determined by the Committee. The Committee may also provide in an Award agreement that in such event, the Participant will forfeit any compensation, gain or other value realized thereafter on the vesting, exercise or settlement of such Award, the sale or other transfer of such Award, or the sale of shares of Common Stock acquired in respect of such Award, and must promptly repay such amounts to the Company. The Committee may also provide in an Award agreement that if the Participant receives any amount in excess of what the Participant should have received under the terms of the Award for any reason (including without limitation by reason of a financial restatement, mistake in calculations or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company. To the extent required by applicable law (including, without limitation, Section 304 of the Sarbanes-Oxley Act and Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act) and/or the rules and regulations of NASDAQ or any other securities exchange or inter-dealer quotation service on which the Common Stock is listed or quoted, or if so required pursuant to a written policy adopted by the Company, Awards shall be subject (including on a retroactive basis) to clawback, forfeiture or similar requirements (and such requirements shall be deemed incorporated by reference into all outstanding Award agreements).

(w)  *No Representations or Covenants With Respect to Tax Qualification.*   Although the Company may endeavor to (i) qualify an Award for favorable U.S. or non-U.S. tax treatment or (ii) avoid adverse tax treatment, the Company makes no representation to that effect and expressly disavows any covenant to maintain favorable or avoid unfavorable tax treatment. The Company shall be unconstrained in its corporate activities without regard to the potential negative tax impact on holders of Awards under the Plan.

(x)  *Code Section 162(m) Re-approval.*   If the Company becomes subject to the provisions of Section 162(m) of the Code, the Committee may, for purposes of exempting certain Awards granted after such time from the deduction limitations of Section 162(m) of the Code, submit the provisions of the Plan regarding Performance Compensation Awards for re-approval by the shareholders of the Company (i) prior to the first shareholder meeting at which directors are to be elected that occurs in calendar year 2019, or such earlier time as required under applicable Treasury Regulations, and (ii) thereafter not later than every five years in accordance with applicable Treasury Regulations. Nothing in this subsection, however, shall affect the validity of Awards granted after such time if such shareholder approval has not been obtained.

(y)  *Expenses; Gender; Titles and Headings.*   The expenses of administering the Plan shall be borne by the Company and its Affiliates. Masculine pronouns and other words of masculine gender shall refer to both men and women. The titles and headings of the sections in the Plan are for convenience of reference only, and in the event of any conflict, the text of the Plan, rather than such titles or headings shall control.

* * *

As adopted by the Board of Directors of the Company on May 18, 2017.

As approved by the shareholders of the Company on June 30, 2017.



2020 Proxy Statement

91

# Exhibit 3

Restricted Stock Unit and
Common Stock Award Agreement
January 23, 2018

**VIRTU FINANCIAL, INC.**
**2015 MANAGEMENT INCENTIVE PLAN**
**EMPLOYEE**
**RESTRICTED STOCK UNIT AND COMMON STOCK AWARD AGREEMENT**

THIS RESTRICTED STOCK UNIT AND COMMON STOCK AWARD AGREEMENT (the "Agreement"), is entered into as of January 23, 2018 (the "Date of Grant"), by and between Virtu Financial, Inc., a Delaware corporation (the "Company"), and Evan Wright_____ (the "Participant").

WHEREAS, the Company has adopted the Virtu Financial, Inc. 2015 Amended and Restated Management Incentive Plan (the "Plan"), pursuant to which shares of Class A Common Stock and Restricted Stock Units ("RSUs") may be granted; and

WHEREAS, the Compensation Committee of the Board of Directors of the Company has determined that it is in the best interests of the Company and its stockholders to grant the shares of Class A Common Stock in recognition of Participant's service to the Company and its Affiliates from January 1, 2017 through December 31, 2017, and RSUs provided for herein to the Participant subject to the terms set forth herein.

NOW, THEREFORE, for and in consideration of the premises and the covenants of the parties contained in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.      **Grant of Common Stock and Restricted Stock Units.**

(a)      Grant. The Company hereby grants to the Participant a total number of shares of Class A Common Stock equal to approximately $ 119,988.00_____ divided by the Issue Price (the "Shares"), and a total number of RSUs equal to approximately $ 179,982.00_____ divided by the Issue Price, in each case on the terms and conditions set forth in this Agreement and as otherwise provided in the Plan.  The RSUs shall be credited to a separate book-entry account maintained for the Participant on the books of the Company, which may be maintained by a third party.  The "Issue Price" shall mean the volume weighted average price of shares of the Company's Class A Common Stock traded during the three days preceding the Date of Grant, as determined by the Company.

(b)      Incorporation by Reference. The provisions of the Plan are incorporated herein by reference.  Except as otherwise expressly set forth herein, this Agreement shall be construed in accordance with the provisions of the Plan and any interpretations, amendments, rules and regulations promulgated by the Committee from time to time pursuant to the Plan.  Any capitalized terms not otherwise defined in this Agreement shall have the definitions set forth in the Plan.  The Committee shall have final authority to interpret and construe the Plan and this Agreement and to make any and all determinations under them, and its decision shall be binding and conclusive upon the Participant and his legal representative in respect of any questions arising under the Plan or this Agreement.  The Participant acknowledges that he has received a copy of the Plan and has had an opportunity to review the Plan and agrees to be bound by all the terms and provisions of the Plan.

2.      **Vesting and Settlement.**

(a)      The Shares shall be one hundred percent (100%) vested as of the Date of Grant.

(b)      Except as may otherwise be provided herein, subject to the Participant's continued employment or service with the Company or an Affiliate, the RSUs shall vest in equal installments on each of the first three (3) anniversaries of the Date of Grant (each such date, a "Vesting Date").  Upon

each Vesting Date, such portion of the RSUs that vest on such date shall no longer be subject to the transfer restrictions pursuant to Section 9(a) hereof or cancellation pursuant to Section 4 hereof. Any fractional RSUs resulting from the application of the vesting schedule shall be aggregated and the RSUs resulting from such aggregation shall vest on the final Vesting Date.

(c)    Vested RSUs shall be settled within ten (10) days following the Vesting Date for such RSUs in shares of Class A Common Stock, or cash, as determined by the Committee in its sole discretion.

**3.    Dividend Equivalents.**  In the event of any issuance of a cash dividend on the shares of Class A Common Stock (a "Dividend"), the Participant shall be entitled to receive, with respect to each RSU granted pursuant to this Agreement and outstanding as of the record date for such Dividend, payment of an amount equal to the Dividend at the same time as the Dividend is paid to holders of shares of Class A Common Stock generally.

**4.    Termination of Employment or Service.**  If the Participant's employment or service with the Company and its Affiliates terminates for any reason, all unvested RSUs shall be cancelled immediately and the Participant shall not be entitled to receive any payments with respect thereto.

**5.    Rights as a Stockholder.**  The Participant shall not be deemed for any purpose to be the owner of any shares of Class A Common Stock constituting the Shares or underlying the RSUs unless, until and to the extent that (i) the Company shall have issued and delivered to the Participant the shares of Class A Common Stock constituting the Shares or underlying the RSUs and (ii) the Participant's name shall have been entered as a stockholder of record with respect to such shares of Class A Common Stock on the books of the Company.  The Company shall cause the actions described in clauses (i) and (ii) of the preceding sentence to occur promptly following settlement as contemplated by this Agreement, subject to compliance with applicable laws.

**6.    Compliance with Legal Requirements.**

(a)    Generally. The granting of the Shares and the granting and settlement of the RSUs, and any other obligations of the Company under this Agreement, shall be subject to all applicable U.S. federal, state and local laws, rules and regulations, all applicable non-U.S. laws, rules and regulations and to such approvals by any regulatory or governmental agency as may be required. The Participant agrees to take all steps the Committee or the Company determines are reasonably necessary to comply with all applicable provisions of U.S. federal and state securities law and non-U.S. securities law in exercising his rights under this Agreement.

(b)    Taxes and Withholding.  The grant of the Shares and the vesting and settlement of the RSUs shall be subject to the Participant satisfying any applicable U.S. federal, state and local tax withholding obligations and non-U.S. tax withholding obligations.  The Participant shall be required to pay to the Company, and the Company shall have the right and is hereby authorized to withhold any cash, shares of Class A Common Stock, other securities or other property or from any compensation or other amounts owing to the Participant, the amount (in cash, Class A Common Stock, other securities or other property) of any required withholding taxes in respect of the Shares or in respect of the RSUs, settlement of the RSUs or any payment or transfer of the RSUs, and to take any such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes.  In its sole discretion, the Company may permit the Participant to satisfy, in whole or in part, the tax obligations by (A) withholding shares of Class A Common Stock from the Shares having a Fair Market Value equal to such withholding liability and (B) withholding shares of Class A Common Stock that would otherwise be deliverable to the Participant upon settlement of the RSUs with a Fair Market Value equal to such withholding liability.

7.      **Clawback.**  Notwithstanding anything to the contrary contained herein, the Committee may cancel the Shares and RSU award if the Participant, without the consent of the Company, has engaged in or engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate while employed by or providing services to the Company or any Affiliate, including fraud or conduct contributing to any financial restatements or irregularities, or violates a non-competition, non-solicitation, non-disparagement, non-disclosure or confidentiality covenant or agreement with the Company or any Affiliate, as determined by the Committee.  In such event, the Participant will forfeit any compensation, gain or other value realized thereafter on the vesting or settlement of the RSUs, the sale or other transfer of the Shares and the RSUs, or the sale of shares of Class A Common Stock acquired in respect of the RSUs, and must promptly repay such amounts to the Company.  If the Participant receives any amount in excess of what the Participant should have received with respect to the Shares or under the terms of the RSUs for any reason (including without limitation by reason of a financial restatement, mistake in calculations or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company.  To the extent required by applicable law and/or the rules and regulations of NASDAQ or any other securities exchange or inter-dealer quotation system on which the Class A Common Stock is listed or quoted, or if so required pursuant to a written policy adopted by the Company, the Shares and the RSUs shall be subject (including on a retroactive basis) to clawback, forfeiture or similar requirements (and such requirements shall be deemed incorporated by reference into this Agreement).

8.      **Contractual Obligations.**

(a)      Nothing in this Agreement shall supersede, modify, replace or cancel any existing contractual obligations, including but not limited to restrictive covenants, applicable to you in _any_ employment agreement, offer letter, prior equity award agreement or any other agreement or contract with the Company or its Affiliates.

(b)      In the event that the Participant violates any of the contractual obligations referred to in this Section 8, in addition to any other remedy which may be available at law or in equity, the RSUs shall be automatically forfeited effective as of the date on which such violation first occurs.  The foregoing rights and remedies are in addition to any other rights and remedies that may be available to the Company and shall not prevent (and the Participant shall not assert that they shall prevent) the Company from bringing one or more actions in any applicable jurisdiction to recover damages as a result of the Participant's breach of such restrictive covenants.

9.      **Miscellaneous.**

(a)      <u>Transferability</u>.  The RSUs may not be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered (a "<u>Transfer</u>") by the Participant other than by will or by the laws of descent and distribution, pursuant to a qualified domestic relations order or as otherwise permitted under Section 15(b) of the Plan.  Any attempted Transfer of the RSUs contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon the RSUs, shall be null and void and without effect.

(b)      <u>Waiver</u>.  Any right of the Company contained in this Agreement may be waived in writing by the Committee. No waiver of any right hereunder by any party shall operate as a waiver of any other right, or as a waiver of the same right with respect to any subsequent occasion for its exercise, or as a waiver of any right to damages. No waiver by any party of any breach of this Agreement shall be held to constitute a waiver of any other breach or a waiver of the continuation of the same breach.

(c)     Section 409A.  The RSUs are intended to be exempt from, or compliant with, Section 409A of the Internal Revenue Code ("Code"). Notwithstanding the foregoing or any provision of the Plan or this Agreement, if any provision of the Plan or this Agreement contravenes Section 409A of the Code or could cause the Participant to incur any tax, interest or penalties under Section 409A of the Code, the Committee may, in its sole discretion and without the Participant's consent, modify such provision to (i) comply with, or avoid being subject to, Section 409A of the Code, or to avoid the incurrence of taxes, interest and penalties under Section 409A of the Code, and/or (ii) maintain, to the maximum extent practicable, the original intent and economic benefit to the Participant of the applicable provision without materially increasing the cost to the Company or contravening the provisions of Section 409A of the Code. This Section 9(c) does not create an obligation on the part of the Company to modify the Plan or this Agreement and does not guarantee that the RSUs will not be subject to interest and penalties under Section 409A.

(d)     General Assets.  All amounts credited in respect of the RSUs to the book-entry account under this Agreement shall continue for all purposes to be part of the general assets of the Company.  The Participant's interest in such account shall make the Participant only a general, unsecured creditor of the Company.

(e)     Notices.  Any notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax, pdf/email or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, to the attention of the General Counsel at the Company's principal executive office.

(f)     Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(g)     No Rights to Employment or Service.  Nothing contained in this Agreement shall be construed as giving the Participant any right to be retained, in any position, as an employee, consultant or director of the Company or its Affiliates or shall interfere with or restrict in any way the rights of the Company or its Affiliates, which are hereby expressly reserved, to remove, terminate or discharge the Participant at any time for any reason whatsoever.

(h)     Fractional Shares.  In lieu of issuing a fraction of a share of Class A Common Stock resulting from adjustment of the Shares or the RSUs pursuant to Section 12 of the Plan or otherwise, the Company shall be entitled to pay to the Participant an amount in cash equal to the Fair Market Value of such fractional share.

(i)     Beneficiary.  The Participant may file with the Committee a written designation of a beneficiary on such form as may be prescribed by the Committee and may, from time to time, amend or revoke such designation.

(j)     Successors.  The terms of this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and of the Participant and the beneficiaries, executors, administrators, heirs and successors of the Participant.

(k)    <u>Entire Agreement</u>.  This Agreement and the Plan contain the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior communications, representations and negotiations in respect thereto, except as set forth in Section 8 hereof. No change, modification or waiver of any provision of this Agreement shall be valid unless the same be in writing and signed by the parties hereto, except for any changes permitted without consent under Section 12 or 14 of the Plan.

(l)    <u>Governing Law and Venue</u>.  This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware.

(i)    <u>Dispute Resolution; Consent to Jurisdiction</u>.  All disputes between or among any Persons arising out of or in any way connected with the Plan, this Agreement, the Shares or the RSUs shall be solely and finally settled by the Committee, acting in good faith, the determination of which shall be final.   Any matters not covered by the preceding sentence shall be solely and finally settled in accordance with the Plan, and the Participant and the Company consent to the personal jurisdiction of the United States Federal and state courts sitting in Wilmington, Delaware as the exclusive jurisdiction with respect to matters arising out of or related to the enforcement of the Committee's determinations and resolution of matters, if any, related to the Plan or this Agreement not required to be resolved by the Committee.  Each such Person hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the last known address of such Person, such service to become effective ten (10) days after such mailing.

(ii)    <u>Waiver of Jury Trial</u>.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated (whether based on contract, tort or any other theory).  Each party hereto (A) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (B) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

(m)    <u>Headings; Gender</u>.  The headings of the Sections hereof are provided for convenience only and are not to serve as a basis for interpretation or construction, and shall not constitute a part, of this Agreement.  Masculine pronouns and other words of masculine gender shall refer to both men and women as appropriate.

(n)    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts (including via facsimile and electronic image scan (pdf)), each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

(o)    <u>Electronic Signature and Delivery</u>.  This Agreement may be accepted by return signature or by electronic confirmation.  By accepting this Agreement, the Participant consents to the electronic delivery of prospectuses, annual reports and other information required to be delivered by U.S. Securities and Exchange Commission rules (which consent may be revoked in writing by the Participant at any time upon three business days' notice to the Company, in which case subsequent prospectuses, annual reports and other information will be delivered in hard copy to the Participant).

      (p)    <u>Electronic Participation in Plan</u>. The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

**[Remainder of page intentionally left blank]**

IN WITNESS WHEREOF, this Agreement has been executed by the Company and the Participant as of the day first written above.

VIRTU FINANCIAL, INC.


By: _____
    Name:  Douglas A. Cifu
    Title:  Chief Executive Officer


**Signature:** *Evan Wright*
           Evan Wright (Jan 30, 2018)

**Email:** ewright@virtu.com
            _____
    Evan Wright

# Exhibit 4

Restricted Stock Unit and
Common Stock Award Agreement

January 23, 2019

**VIRTU FINANCIAL, INC.**
**AMENDED AND RESTATED**
**2015 MANAGEMENT INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AND COMMON STOCK AWARD AGREEMENT**

THIS RESTRICTED STOCK UNIT AND COMMON STOCK AWARD AGREEMENT (the "Agreement"), is entered into as of January 23, 2019 (the "Date of Grant"), by and between Virtu Financial, Inc., a Delaware corporation (the "Company"), and Evan Wright (the "Participant").

WHEREAS, the Company has adopted the Virtu Financial, Inc. Amended and Restated 2015 Management Incentive Plan (the "Plan"), pursuant to which shares of Class A Common Stock and Restricted Stock Units ("RSUs") may be granted; and

WHEREAS, the Compensation Committee of the Board of Directors of the Company has determined that it is in the best interests of the Company and its stockholders to grant the shares of Class A Common Stock in recognition of Participant's service to the Company and its Affiliates from January 1, 2018 through December 31, 2018, and RSUs provided for herein to the Participant subject to the terms set forth herein.

NOW, THEREFORE, for and in consideration of the premises and the covenants of the parties contained in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1. **Grant of Common Stock and Restricted Stock Units.**

   (a)    Grant. The Company hereby grants to the Participant a total number of shares of Class A Common Stock equal to approximately **$264,000** divided by the Issue Price (the "Shares"), and a total number of RSUs equal to approximately **$396,000** divided by the Issue Price, in each case on the terms and conditions set forth in this Agreement and as otherwise provided in the Plan. The RSUs shall be credited to a separate book-entry account maintained for the Participant on the books of the Company, which may be maintained by a third party. The "Issue Price" shall mean the volume weighted average price of shares of the Company's Class A Common Stock traded during the three days preceding the Date of Grant, as determined by the Company.

   (b)    Incorporation by Reference. The provisions of the Plan are incorporated herein by reference. Except as otherwise expressly set forth herein, this Agreement shall be construed in accordance with the provisions of the Plan and any interpretations, amendments, rules and regulations promulgated by the Committee from time to time pursuant to the Plan. Any capitalized terms not otherwise defined in this Agreement shall have the definitions set forth in the Plan. The Committee shall have final authority to interpret and construe the Plan and this Agreement and to make any and all determinations under them, and its decision shall be binding and conclusive upon the Participant and his legal representative in respect of any questions arising under the Plan or this Agreement. The Participant acknowledges that he has received a copy of the Plan and has had an opportunity to review the Plan and agrees to be bound by all the terms and provisions of the Plan.

2. **Vesting and Settlement.**

   (a)    The Shares shall be one hundred percent (100%) vested as of the Date of Grant.

   (b)    Except as may otherwise be provided herein, subject to the Participant's continued employment or service with the Company or an Affiliate, the RSUs shall vest in equal installments on each of the first three (3) anniversaries of the Date of Grant (each such date, a "Vesting Date"). Upon

each Vesting Date, such portion of the RSUs that vest on such date shall no longer be subject to the transfer restrictions pursuant to Section 9(a) hereof or cancellation pursuant to Section 4 hereof.  Any fractional RSUs resulting from the application of the vesting schedule shall be aggregated and the RSUs resulting from such aggregation shall vest on the final Vesting Date.

       (c)     Vested RSUs shall be settled within ten (10) days following the Vesting Date for such RSUs in shares of Class A Common Stock, or cash, as determined by the Committee in its sole discretion.

**3.**     **Dividend Equivalents.**  In the event of any issuance of a cash dividend on the shares of Class A Common Stock (a "Dividend"), the Participant shall be entitled to receive, with respect to each RSU granted pursuant to this Agreement and outstanding as of the record date for such Dividend, payment of an amount equal to the Dividend at the same time as the Dividend is paid to holders of shares of Class A Common Stock generally.

**4.**     **Termination of Employment or Service.**  If the Participant's employment or service with the Company and its Affiliates terminates for any reason, all unvested RSUs shall be cancelled immediately and the Participant shall not be entitled to receive any payments with respect thereto.

**5.**     **Rights as a Stockholder.**  The Participant shall not be deemed for any purpose to be the owner of any shares of Class A Common Stock constituting the Shares or underlying the RSUs unless, until and to the extent that (i) the Company shall have issued and delivered to the Participant the shares of Class A Common Stock constituting the Shares or underlying the RSUs and (ii) the Participant's name shall have been entered as a stockholder of record with respect to such shares of Class A Common Stock on the books of the Company.  The Company shall cause the actions described in clauses (i) and (ii) of the preceding sentence to occur promptly following settlement as contemplated by this Agreement, subject to compliance with applicable laws.

**6.**     **Compliance with Legal Requirements.**

       (a)     Generally. The granting of the Shares and the granting and settlement of the RSUs, and any other obligations of the Company under this Agreement, shall be subject to all applicable U.S. federal, state and local laws, rules and regulations, all applicable non-U.S. laws, rules and regulations and to such approvals by any regulatory or governmental agency as may be required. The Participant agrees to take all steps the Committee or the Company determines are reasonably necessary to comply with all applicable provisions of U.S. federal and state securities law and non-U.S. securities law in exercising his rights under this Agreement.

       (b)     Taxes and Withholding.  The grant of the Shares and the vesting and settlement of the RSUs shall be subject to the Participant satisfying any applicable U.S. federal, state and local tax withholding obligations and non-U.S. tax withholding obligations.  The Participant shall be required to pay to the Company, and the Company shall have the right and is hereby authorized to withhold any cash, shares of Class A Common Stock, other securities or other property or from any compensation or other amounts owing to the Participant, the amount (in cash, Class A Common Stock, other securities or other property) of any required withholding taxes in respect of the Shares or in respect of the RSUs, settlement of the RSUs or any payment or transfer of the RSUs, and to take any such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes.  In its sole discretion, the Company may permit the Participant to satisfy, in whole or in part, the tax obligations by (A) withholding shares of Class A Common Stock from the Shares having a Fair Market Value equal to such withholding liability and (B) withholding shares of Class A Common Stock that would otherwise be deliverable to the Participant upon settlement of the RSUs with a Fair Market Value equal to such withholding liability.

7.    **Clawback.**  Notwithstanding anything to the contrary contained herein, the Committee may cancel the Shares and RSU award if the Participant, without the consent of the Company, has engaged in or engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate while employed by or providing services to the Company or any Affiliate, including fraud or conduct contributing to any financial restatements or irregularities, or violates a non-competition, non-solicitation, non-disparagement, non-disclosure or confidentiality covenant or agreement with the Company or any Affiliate, as determined by the Committee.  In such event, the Participant will forfeit any compensation, gain or other value realized previously or thereafter on the vesting or settlement of the RSUs, the sale or other transfer of the Shares and the RSUs, or the sale of shares of Class A Common Stock acquired in respect of the RSUs, and must promptly repay such amounts to the Company.  If the Participant receives any amount in excess of what the Participant should have received with respect to the Shares or under the terms of the RSUs for any reason (including without limitation by reason of a financial restatement, mistake in calculations or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company.  To the extent required by applicable law and/or the rules and regulations of NASDAQ or any other securities exchange or inter-dealer quotation system on which the Class A Common Stock is listed or quoted, or if so required pursuant to a written policy adopted by the Company, the Shares and the RSUs shall be subject (including on a retroactive basis) to clawback, forfeiture or similar requirements (and such requirements shall be deemed incorporated by reference into this Agreement).

8.    **Contractual Obligations.**

(a)    Nothing in this Agreement shall supersede, modify, replace or cancel any existing contractual obligations, including but not limited to restrictive covenants, applicable to you in *any* employment agreement, offer letter, prior equity award agreement or any other agreement or contract with the Company or its Affiliates.

(b)    In the event that the Participant violates any of the contractual obligations referred to in this Section 8, in addition to any other remedy which may be available at law or in equity, the RSUs shall be automatically forfeited effective as of the date on which such violation first occurs.  The foregoing rights and remedies are in addition to any other rights and remedies that may be available to the Company and shall not prevent (and the Participant shall not assert that they shall prevent) the Company from bringing one or more actions in any applicable jurisdiction to recover damages as a result of the Participant's breach of such restrictive covenants.

9.    **Miscellaneous.**

(a)    <u>Transferability</u>.  The RSUs may not be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered (a "<u>Transfer</u>") by the Participant other than by will or by the laws of descent and distribution, pursuant to a qualified domestic relations order or as otherwise permitted under Section 15(b) of the Plan.  Any attempted Transfer of the RSUs contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon the RSUs, shall be null and void and without effect.

(b)    <u>Waiver</u>.  Any right of the Company contained in this Agreement may be waived in writing by the Committee. No waiver of any right hereunder by any party shall operate as a waiver of any other right, or as a waiver of the same right with respect to any subsequent occasion for its exercise, or as a waiver of any right to damages. No waiver by any party of any breach of this Agreement shall be held to constitute a waiver of any other breach or a waiver of the continuation of the same breach.

(c)    <u>Section 409A</u>.  The RSUs are intended to be exempt from, or compliant with, Section 409A of the Internal Revenue Code ("Code"). Notwithstanding the foregoing or any provision of the Plan or this Agreement, if any provision of the Plan or this Agreement contravenes Section 409A of the Code or could cause the Participant to incur any tax, interest or penalties under Section 409A of the Code, the Committee may, in its sole discretion and without the Participant's consent, modify such provision to (i) comply with, or avoid being subject to, Section 409A of the Code, or to avoid the incurrence of taxes, interest and penalties under Section 409A of the Code, and/or (ii) maintain, to the maximum extent practicable, the original intent and economic benefit to the Participant of the applicable provision without materially increasing the cost to the Company or contravening the provisions of Section 409A of the Code. This Section 9(c) does not create an obligation on the part of the Company to modify the Plan or this Agreement and does not guarantee that the RSUs will not be subject to interest and penalties under Section 409A.

(d)    <u>General Assets</u>.  All amounts credited in respect of the RSUs to the book-entry account under this Agreement shall continue for all purposes to be part of the general assets of the Company.  The Participant's interest in such account shall make the Participant only a general, unsecured creditor of the Company.

(e)    <u>Notices</u>.  Any notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax, pdf/email or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, to the attention of the General Counsel at the Company's principal executive office.

(f)    <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(g)    <u>No Rights to Employment or Service</u>.  Nothing contained in this Agreement shall be construed as giving the Participant any right to be retained, in any position, as an employee, consultant or director of the Company or its Affiliates or shall interfere with or restrict in any way the rights of the Company or its Affiliates, which are hereby expressly reserved, to remove, terminate or discharge the Participant at any time for any reason whatsoever.

(h)    <u>Fractional Shares</u>.  In lieu of issuing a fraction of a share of Class A Common Stock resulting from adjustment of the Shares or the RSUs pursuant to Section 12 of the Plan or otherwise, the Company shall be entitled to pay to the Participant an amount in cash equal to the Fair Market Value of such fractional share.

(i)    <u>Beneficiary</u>.  The Participant may file with the Committee a written designation of a beneficiary on such form as may be prescribed by the Committee and may, from time to time, amend or revoke such designation.

(j)    <u>Successors</u>.  The terms of this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and of the Participant and the beneficiaries, executors, administrators, heirs and successors of the Participant.

(k)     Entire Agreement.  This Agreement and the Plan contain the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior communications, representations and negotiations in respect thereto, except as set forth in Section 8 hereof. No change, modification or waiver of any provision of this Agreement shall be valid unless the same be in writing and signed by the parties hereto, except for any changes permitted without consent under Section 12 or 14 of the Plan.

(l)     Governing Law and Venue.  This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware.

(i)     Dispute Resolution; Consent to Jurisdiction.  All disputes between or among any Persons arising out of or in any way connected with the Plan, this Agreement, the Shares or the RSUs shall be solely and finally settled by the Committee, acting in good faith, the determination of which shall be final.   Any matters not covered by the preceding sentence shall be solely and finally settled in accordance with the Plan, and the Participant and the Company consent to the personal jurisdiction of the United States Federal and state courts sitting in Wilmington, Delaware as the exclusive jurisdiction with respect to matters arising out of or related to the enforcement of the Committee's determinations and resolution of matters, if any, related to the Plan or this Agreement not required to be resolved by the Committee.  Each such Person hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the last known address of such Person, such service to become effective ten (10) days after such mailing.

(ii)     Waiver of Jury Trial.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated (whether based on contract, tort or any other theory).  Each party hereto (A) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (B) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

(m)     Headings; Gender.  The headings of the Sections hereof are provided for convenience only and are not to serve as a basis for interpretation or construction, and shall not constitute a part, of this Agreement.  Masculine pronouns and other words of masculine gender shall refer to both men and women as appropriate.

(n)     Counterparts. This Agreement may be executed in one or more counterparts (including via facsimile and electronic image scan (pdf)), each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

(o)     Electronic Signature and Delivery.  This Agreement may be accepted by return signature or by electronic confirmation.  By accepting this Agreement, the Participant consents to the electronic delivery of prospectuses, annual reports and other information required to be delivered by U.S. Securities and Exchange Commission rules (which consent may be revoked in writing by the Participant at any time upon three business days' notice to the Company, in which case subsequent prospectuses, annual reports and other information will be delivered in hard copy to the Participant).

(p)     <u>Electronic Participation in Plan</u>.  The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means.  The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

**[Remainder of page intentionally left blank]**

IN WITNESS WHEREOF, this Agreement has been executed by the Company and the Participant as of the day first written above.

VIRTU FINANCIAL, INC.

By: _____
    Name:  Douglas A. Cifu
    Title:  Chief Executive Officer


Evan Wright (Feb 5, 2019)
_____
Evan Wright

# 5824_RSU and Stock Award Agreements 1.23.2019_Evan Wright

**Final Audit Report** 2019-02-05

| | |
|---|---|
| Created: | 2019-01-25 |
| By: | Alla Vodarsky (avodarsky@virtu.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAjNCdN0UYBGEmMx9zkwQiEsN4XI-NV6Ak |

## "5824_RSU and Stock Award Agreements 1.23.2019_Evan Wright" History

📄 Document created by Alla Vodarsky (avodarsky@virtu.com)
2019-01-25 - 0:16:18 AM GMT- IP address: 209.191.245.11

📧 Document emailed to Evan Wright (ewright@virtu.com) for signature
2019-01-25 - 0:16:46 AM GMT

📄 Document viewed by Evan Wright (ewright@virtu.com)
2019-01-25 - 0:28:39 AM GMT- IP address: 73.178.30.220

📄 Document viewed by Evan Wright (ewright@virtu.com)
2019-02-04 - 3:25:44 PM GMT- IP address: 73.178.30.220

✍️ Document e-signed by Evan Wright (ewright@virtu.com)
Signature Date: 2019-02-05 - 1:09:37 PM GMT - Time Source: server- IP address: 172.56.37.109

✅ Signed document emailed to Alla Vodarsky (avodarsky@virtu.com) and Evan Wright (ewright@virtu.com)
2019-02-05 - 1:09:37 PM GMT

Adobe Sign

# Exhibit 5

Restricted Stock Unit and
Common Stock Award Agreement

January 24, 2020

**VIRTU FINANCIAL, INC.**
**AMENDED AND RESTATED**
**2015 MANAGEMENT INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AND COMMON STOCK AWARD AGREEMENT**

THIS RESTRICTED STOCK UNIT AND COMMON STOCK AWARD AGREEMENT (the "Agreement"), is entered into as of January 24, 2020 (the "Date of Grant"), by and between Virtu Financial, Inc., a Delaware corporation (the "Company"), and Evan Wright (the "Participant").

WHEREAS, the Company has adopted the Virtu Financial, Inc. Amended and Restated 2015 Management Incentive Plan (the "Plan"), pursuant to which shares of Class A Common Stock and Restricted Stock Units ("RSUs") may be granted; and

WHEREAS, the Compensation Committee of the Board of Directors of the Company has determined that it is in the best interests of the Company and its stockholders to grant the shares of Class A Common Stock in recognition of Participant's service to the Company and its Affiliates from January 1, 2019 through December 31, 2019, and RSUs provided for herein to the Participant subject to the terms set forth herein.

NOW, THEREFORE, for and in consideration of the premises and the covenants of the parties contained in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.      **Grant of Common Stock and Restricted Stock Units.**

(a)      Grant. The Company hereby grants to the Participant a total number of shares of Class A Common Stock equal to approximately $240,000.00 divided by the Issue Price (the "Shares"), and a total number of RSUs equal to approximately $360,000.00 divided by the Issue Price, in each case on the terms and conditions set forth in this Agreement and as otherwise provided in the Plan. The RSUs shall be credited to a separate book-entry account maintained for the Participant on the books of the Company, which may be maintained by a third party. The "Issue Price" shall mean the volume weighted average price of shares of the Company's Class A Common Stock traded during the three days preceding the Date of Grant, as determined by the Company.

(b)      Incorporation by Reference. The provisions of the Plan are incorporated herein by reference. Except as otherwise expressly set forth herein, this Agreement shall be construed in accordance with the provisions of the Plan and any interpretations, amendments, rules and regulations promulgated by the Committee from time to time pursuant to the Plan. Any capitalized terms not otherwise defined in this Agreement shall have the definitions set forth in the Plan. The Committee shall have final authority to interpret and construe the Plan and this Agreement and to make any and all determinations under them, and its decision shall be binding and conclusive upon the Participant and his legal representative in respect of any questions arising under the Plan or this Agreement. The Participant acknowledges that he has received a copy of the Plan and has had an opportunity to review the Plan and agrees to be bound by all the terms and provisions of the Plan.

2.      **Vesting and Settlement.**

(a)      The Shares shall be one hundred percent (100%) vested as of the Date of Grant.

(b)      Except as may otherwise be provided herein, subject to the Participant's continued employment or service with the Company or an Affiliate, the RSUs shall vest in equal installments on each of the first three (3) anniversaries of the Date of Grant (each such date, a "Vesting Date"). Upon each Vesting Date, such portion of the RSUs that vest on such date shall no longer be subject to the

transfer restrictions pursuant to Section 9(a) hereof or cancellation pursuant to Section 4 hereof. Any fractional RSUs resulting from the application of the vesting schedule shall be aggregated and the RSUs resulting from such aggregation shall vest on the final Vesting Date.

(c)     Vested RSUs shall be settled within ten (10) days following the Vesting Date for such RSUs in shares of Class A Common Stock, or cash, as determined by the Committee in its sole discretion.

**3.      Dividend Equivalents.** In the event of any issuance of a cash dividend on the shares of Class A Common Stock (a "Dividend"), the Participant shall be entitled to receive, with respect to each RSU granted pursuant to this Agreement and outstanding as of the record date for such Dividend, payment of an amount equal to the Dividend at the same time as the Dividend is paid to holders of shares of Class A Common Stock generally.

**4.      Termination of Employment or Service.** If the Participant's employment or service with the Company and its Affiliates terminates for any reason, all unvested RSUs shall be cancelled immediately and the Participant shall not be entitled to receive any payments with respect thereto.

**5.      Rights as a Stockholder.** The Participant shall not be deemed for any purpose to be the owner of any shares of Class A Common Stock constituting the Shares or underlying the RSUs unless, until and to the extent that (i) the Company shall have issued and delivered to the Participant the shares of Class A Common Stock constituting the Shares or underlying the RSUs and (ii) the Participant's name shall have been entered as a stockholder of record with respect to such shares of Class A Common Stock on the books of the Company. The Company shall cause the actions described in clauses (i) and (ii) of the preceding sentence to occur promptly following settlement as contemplated by this Agreement, subject to compliance with applicable laws.

**6.      Compliance with Legal Requirements.**

(a)     Generally. The granting of the Shares and the granting and settlement of the RSUs, and any other obligations of the Company under this Agreement, shall be subject to all applicable U.S. federal, state and local laws, rules and regulations, all applicable non-U.S. laws, rules and regulations and to such approvals by any regulatory or governmental agency as may be required. The Participant agrees to take all steps the Committee or the Company determines are reasonably necessary to comply with all applicable provisions of U.S. federal and state securities law and non-U.S. securities law in exercising his rights under this Agreement.

(b)     Taxes and Withholding.  The grant of the Shares and the vesting and settlement of the RSUs shall be subject to the Participant satisfying any applicable U.S. federal, state and local tax withholding obligations and non-U.S. tax withholding obligations. The Participant shall be required to pay to the Company, and the Company shall have the right and is hereby authorized to withhold any cash, shares of Class A Common Stock, other securities or other property or from any compensation or other amounts owing to the Participant, the amount (in cash, Class A Common Stock, other securities or other property) of any required withholding taxes in respect of the Shares or in respect of the RSUs, settlement of the RSUs or any payment or transfer of the RSUs, and to take any such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes. In its sole discretion, the Company may permit the Participant to satisfy, in whole or in part, the tax obligations by (A) withholding shares of Class A Common Stock from the Shares having a Fair Market Value equal to such withholding liability and (B) withholding shares of Class A Common Stock that would otherwise be deliverable to the Participant upon settlement of the RSUs with a Fair Market Value equal to such withholding liability.

7.     **Clawback.** Notwithstanding anything to the contrary contained herein, the Committee may cancel the Shares and RSU award if the Participant, without the consent of the Company, has engaged in or engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate while employed by or providing services to the Company or any Affiliate, including fraud or conduct contributing to any financial restatements or irregularities, or violates a non-competition, non-solicitation, non-disparagement, non-disclosure or confidentiality covenant or agreement with the Company or any Affiliate, as determined by the Committee. In such event, the Participant will forfeit any compensation, gain or other value realized previously or thereafter on the vesting or settlement of the RSUs, the sale or other transfer of the Shares and the RSUs, or the sale of shares of Class A Common Stock acquired in respect of the RSUs, and must promptly repay such amounts to the Company. If the Participant receives any amount in excess of what the Participant should have received with respect to the Shares or under the terms of the RSUs for any reason (including without limitation by reason of a financial restatement, mistake in calculations or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company. To the extent required by applicable law and/or the rules and regulations of NASDAQ or any other securities exchange or inter-dealer quotation system on which the Class A Common Stock is listed or quoted, or if so required pursuant to a written policy adopted by the Company, the Shares and the RSUs shall be subject (including on a retroactive basis) to clawback, forfeiture or similar requirements (and such requirements shall be deemed incorporated by reference into this Agreement).

8.     **Contractual Obligations.**

(a)     Nothing in this Agreement shall supersede, modify, replace or cancel any existing contractual obligations, including but not limited to restrictive covenants, applicable to you in *any* employment agreement, offer letter, prior equity award agreement or any other agreement or contract with the Company or its Affiliates.

(b)     In the event that the Participant violates any of the contractual obligations referred to in this Section 8, in addition to any other remedy which may be available at law or in equity, the RSUs shall be automatically forfeited effective as of the date on which such violation first occurs. The foregoing rights and remedies are in addition to any other rights and remedies that may be available to the Company and shall not prevent (and the Participant shall not assert that they shall prevent) the Company from bringing one or more actions in any applicable jurisdiction to recover damages as a result of the Participant's breach of such restrictive covenants.

9.     **Miscellaneous.**

(a)     <u>Transferability</u>. The RSUs may not be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered (a "<u>Transfer</u>") by the Participant other than by will or by the laws of descent and distribution, pursuant to a qualified domestic relations order or as otherwise permitted under Section 15(b) of the Plan. Any attempted Transfer of the RSUs contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon the RSUs, shall be null and void and without effect.

(b)     <u>Waiver</u>. Any right of the Company contained in this Agreement may be waived in writing by the Committee. No waiver of any right hereunder by any party shall operate as a waiver of any other right, or as a waiver of the same right with respect to any subsequent occasion for its exercise, or as a waiver of any right to damages. No waiver by any party of any breach of this Agreement shall be held to constitute a waiver of any other breach or a waiver of the continuation of the same breach.

(c)    Section 409A.  The RSUs are intended to be exempt from, or compliant with, Section 409A of the Internal Revenue Code ("Code"). Notwithstanding the foregoing or any provision of the Plan or this Agreement, if any provision of the Plan or this Agreement contravenes Section 409A of the Code or could cause the Participant to incur any tax, interest or penalties under Section 409A of the Code, the Committee may, in its sole discretion and without the Participant's consent, modify such provision to (i) comply with, or avoid being subject to, Section 409A of the Code, or to avoid the incurrence of taxes, interest and penalties under Section 409A of the Code, and/or (ii) maintain, to the maximum extent practicable, the original intent and economic benefit to the Participant of the applicable provision without materially increasing the cost to the Company or contravening the provisions of Section 409A of the Code. This Section 9(c) does not create an obligation on the part of the Company to modify the Plan or this Agreement and does not guarantee that the RSUs will not be subject to interest and penalties under Section 409A.

(d)    General Assets.  All amounts credited in respect of the RSUs to the book-entry account under this Agreement shall continue for all purposes to be part of the general assets of the Company.  The Participant's interest in such account shall make the Participant only a general, unsecured creditor of the Company.

(e)    Notices.  Any notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax, pdf/email or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, to the attention of the General Counsel at the Company's principal executive office.

(f)    Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(g)    No Rights to Employment or Service.  Nothing contained in this Agreement shall be construed as giving the Participant any right to be retained, in any position, as an employee, consultant or director of the Company or its Affiliates or shall interfere with or restrict in any way the rights of the Company or its Affiliates, which are hereby expressly reserved, to remove, terminate or discharge the Participant at any time for any reason whatsoever.

(h)    Fractional Shares.  In lieu of issuing a fraction of a share of Class A Common Stock resulting from adjustment of the Shares or the RSUs pursuant to Section 12 of the Plan or otherwise, the Company shall be entitled to pay to the Participant an amount in cash equal to the Fair Market Value of such fractional share.

(i)    Beneficiary.  The Participant may file with the Committee a written designation of a beneficiary on such form as may be prescribed by the Committee and may, from time to time, amend or revoke such designation.

(j)    Successors.  The terms of this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and of the Participant and the beneficiaries, executors, administrators, heirs and successors of the Participant.

(k)    Entire Agreement.  This Agreement and the Plan contain the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior communications, representations and negotiations in respect thereto, except as set forth in Section 8 hereof. No change, modification or waiver of any provision of this Agreement shall be valid unless the same be in writing and signed by the parties hereto, except for any changes permitted without consent under Section 12 or 14 of the Plan.

(l)    Governing Law and Venue.  This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware.

(i)    Dispute Resolution; Consent to Jurisdiction.  All disputes between or among any Persons arising out of or in any way connected with the Plan, this Agreement, the Shares or the RSUs shall be solely and finally settled by the Committee, acting in good faith, the determination of which shall be final.   Any matters not covered by the preceding sentence shall be solely and finally settled in accordance with the Plan, and the Participant and the Company consent to the personal jurisdiction of the United States Federal and state courts sitting in Wilmington, Delaware as the exclusive jurisdiction with respect to matters arising out of or related to the enforcement of the Committee's determinations and resolution of matters, if any, related to the Plan or this Agreement not required to be resolved by the Committee. Each such Person hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the last known address of such Person, such service to become effective ten (10) days after such mailing.

(ii)    Waiver of Jury Trial.  Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated (whether based on contract, tort or any other theory).  Each party hereto (A) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (B) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

(m)    Headings; Gender.  The headings of the Sections hereof are provided for convenience only and are not to serve as a basis for interpretation or construction, and shall not constitute a part, of this Agreement. Masculine pronouns and other words of masculine gender shall refer to both men and women as appropriate.

(n)    Counterparts. This Agreement may be executed in one or more counterparts (including via facsimile and electronic image scan (pdf)), each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

(o)    Electronic Signature and Delivery.  This Agreement may be accepted by return signature or by electronic confirmation.  By accepting this Agreement, the Participant consents to the electronic delivery of prospectuses, annual reports and other information required to be delivered by U.S. Securities and Exchange Commission rules (which consent may be revoked in writing by the Participant at any time upon three business days' notice to the Company, in which case subsequent prospectuses, annual reports and other information will be delivered in hard copy to the Participant).

(p)     <u>Electronic Participation in Plan</u>. The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

**[Remainder of page intentionally left blank]**

**To accept or reject your Restricted Stock award, please complete the on-line form ("Accept or Reject Your Grant") as promptly as possible, but, in any case, within thirty (30) days after the Grant Date. If you accept your award you will be deemed to have agreed to the terms and conditions set forth in this Agreement and the terms and conditions of the Plan, all of which are made part of this Agreement. Your Agreement is available to you online in your Schwab Equity Award Center (EAC) account via this link https://www.schwab.com/public/eac/home.**

VIRTU FINANCIAL, INC.

By: _____
    Name: Douglas A. Cifu
    Title: Chief Executive Officer



Best viewed in Adobe Readers, please click to download: Download

# Exhibit 6

# Order to Show Cause

Case 1:21-cv-00675-CFC    Document 1-1    Filed 05/10/21    Page 53 of 71 PageID #: 65

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| VIRTU FINANCIAL, INC., VIRTU AMERICAS, LLC, | **COMMERCIAL DIVISION** |
| Plaintiffs, | **ORDER TO SHOW CAUSE** |
| -against- | Index No. 651133-2021 |
| EVAN WRIGHT, | Mtn. Seq. 001 |
| Defendant. | |

**UPON** the annexed Emergency Affirmation of Jacob M. Kaplan, Esq., sworn to February 21, 2021, Declaration of Hatice Unal, sworn to February 21, 2021, Declaration of Nancy Lenart, sworn to February 20, 2021, Declaration of Rob Lopez, sworn to February 20, 2021, Affirmation of William Dugan, Esq., sworn to February 21, 2021, together with exhibits annexed thereto**,** and the accompanying Memorandum of Law, the accompanying Complaint; and upon all of the pleadings and proceedings heretofore had herein, and sufficient cause appearing therefor; it is

**ORDERED** that Defendant show cause at Courtroom 238 in the New York Supreme Court Courthouse, Commercial Division for New York County at 60 Centre Street New York, NY 10007 on the **20th day of April, 2021 at  12 p.m**., or as soon thereafter as counsel can be heard, why an order should not be made and entered (a) requiring Defendant to keep his personal devices that were previously used to access Virtu confidential information, including without limitation, his personal desktop computer, his personal laptop computer, and his personal cell phone that received Virtu email, in attorney escrow; and (b) restraining Defendant from using these personal devices in any way,

1

including by powering on the devices or connecting them to any network, including the Internet, until

the final resolution of the related FINRA Arbitration; and (c) awarding all such other and further relief

as the Court deems just, equitable and proper; and it is further

**ORDERED**, that Defendant shall <u>either  (i) permit the plaintiff to make a forensic mirror image</u>

<u>of </u>his personal devices that were previously used to access Virtu confidential information, including

without limitation, his personal desktop computer, his personal laptop computer, and his personal cell

phone that received Virtu email, <u>which forensic imaging shall be done by plaintiff at defendant's home</u>

<u>or other mutually convenient and agreed upon location,</u> or (ii) permit said devices to be delivered to

attorney escrow <u>for forensic examination</u> (in which case the defendant shall have a print out of all his

contacts), or the parties will agree to (iii) <u>another mutually agreeable protocol with respect to the</u>

<u>inspection of said devices,  which election defendant shall make and communicate to plaintiff by</u>

<u>Monday 3-1-2021 at </u>5 pm; and it is further

**ORDERED** <u>that the parties will agree on search terms by end of business 3/3/2021; and it is</u>

<u>further </u>

**ORDERED** that <u>pending the forensic imaging or delivery of devices to the plaintiff</u>  ~~hearing and~~

~~determination of this motion,~~ Defendant shall not ~~use~~ <u>delete or otherwise alter any of the information</u>

<u>contained</u> on these personal devices in any way, ~~including by powering on the devices or connecting~~

~~them to any network, including the Internet~~; and it is further

**ORDERED** that service of a copy of this order together with the papers upon which it is granted,

2

shall be deemed sufficient if made by electronic mail to Defendant, on or before the 1st day of March,

2021; and it is further


      **ORDERED** that answering papers in opposition to this motion, if any, shall be served and filed

on or before the 15 day of March, 2021.


DATED:   New York, New York
ISSUED:   February 26, 2021

ENTER:

Hon. Andrew Borrok
J.S.C.

Hon. Andrew Borrok

3

# Exhibit 7

3/17/2021 Chair's Injunction Order



## Order on Request for Permanent Injunction

At the conclusion of a hearing on a request for permanent injunction under FINRA rules[1], please complete this form.

**An in-person or telephonic hearing on a request for Permanent Injunction under FINRA rules was held in the matter of:**

CLAIMANT(S): _____

RESPONDENT(S): _____

CASE #: _____

The hearing was held on _____(month/date/year).
The follow individuals participated in the hearing: [list the attending individuals]

Chairperson: _____

Panelist: _____

Panelist: _____

Claimant's Representative: _____

#1 Respondent's Representative: _____

#2 Respondent's Representative: _____

FINRA Dispute Resolution Staff: _____

At the hearing for permanent injunction, the following occurred:

1.   ~~Respondent _____ filed its answer to the statement of claim.~~

---

[1] Industry Code: Rule 13804; Old Code: Rule 10335

2.  ~~Respondent _____ filed its answer to the statement of claim.~~

3.  The parties accepted the panel's composition.  (If not, please explain.)
_____
_____
_____

4.  In determining the request for permanent injunction, the panel used the following legal standard (Select one):
   a.  Choice of law as indicated in the parties' agreement; or,
   b.  The law of state where events occurred if there is no agreement.

5.  On Claimant _____'s request for permanent injunction, the panel rules as follows (circle and complete all selections that apply):
   a.  Granted in part per the attached supplement.
   b.  ~~Denied~~
   c.  ~~The permanent injunction filed by _____ shall become effective:~~
      i.  ~~Upon the expiration of the TRO used by the Court on month/date/year _____ and expire on _____~~

      ii.  ~~Immediately and will expire on (month/date/year) _____~~

6.  ~~On Respondent _____'s request for permanent injunction, the panel rules as follows (circle and complete all selections that apply):~~
   a.  ~~Granted~~
   b.  ~~Denied~~
   c.  ~~The permanent injunction filed by _____ shall become effective:~~
      i.  ~~Upon the expiration of the TRO used by the Court on month/date/year _____ and expire on _____~~

      ii.  ~~Immediately and will expire on (month/date/year) _____~~

7.  The parties are prohibited from seeking an extension of the court's order.
      Yes    or    No

8. ~~The parties are directed to jointly move the court to modify or dissolve the court order.  The parties shall file this motion within _____ days from the date of this order.~~

9. ~~The panel has scheduled additional hearings to resolve damages and other issues as follows:~~

   a. ~~The next scheduled hearing session will be held on (month/date/year) _____ at _____ (time). The following dates have also been reserved for this hearing:~~
   ~~_____~~

   b. ~~The arbitrators and parties have tentatively reserved _____ (month/date/year) at _____ (time) for a Pre-hearing conference to resolve~~
   ~~_____~~

   c. ~~The Chairperson and parties have tentatively reserved _____ (month/day/year) at _____ (time) for a Pre-hearing conference to resolve the following discovery matters:~~
   ~~_____~~

   d. ~~If Pre-hearing briefs are filed, they must be filed by: _____~~

      ~~Response filed by: _____~~

      ~~Reply filed by: _____~~

   e. ~~If motions are filed, they must be filed by: _____~~

      ~~Response filed by: _____~~

      ~~Reply filed by: _____~~

10. Other rulings (i.e., arbitration fees, extra fees to be deposited, etc.):
    a. The parties are liable for the increased arbitrator honoraria on the hearing for the permanent injunction as follows:

    _____
    _____
    _____

b. ~~The parties are liable for the reasonable travel expenses of arbitrator,~~ ~~_____, who traveled outside his or~~ ~~her assigned hearing location as follows:~~

~~Claimant #1 is assessed _____~~

~~Claimant #2 is assessed _____~~

~~Respondent #1 is assessed _____~~

~~Respondent #2 is assessed _____~~

~~Respondent #3 is assessed _____~~

11. If the parties settle this matter with no further hearings:

   a. The cost of this permanent injunction hearing and any other hearing, including initial Pre-hearing conference or Pre-hearing conference, will be borne as follows:

   Claimant #1 is assessed _____

   Claimant #2 is assessed _____

   Respondent #1 is assessed _____

   Respondent #2 is assessed _____

   Respondent #3 is assessed _____

   ~~b. Is this preliminary assessment joint and several?    Yes  or    No~~

   ~~c. If this preliminary assessment is joint and several, state below the parties against whom it is made (circle all that applies):~~
   ~~i. Claimants only~~
   ~~ii. Respondents only~~
   ~~iii. Claimants and Respondents~~
   ~~_____~~
   ~~_____~~
   ~~_____~~

NOTE:  The Rule provides that the parties shall equally pay the difference between regular and the injunctive relief honorarium[3] and that the arbitrators may reallocate this additional amount among the parties in the award.  ***This increased honorarium applies only to hearings for permanent injunction and does not apply to Pre-hearing conferences or additional hearings on damages or other issues.***

FINRA rules[4] provides that the parties shall jointly bear an arbitrator's reasonable travel-related costs and expenses for required travel to a hearing location other than the arbitrator's primary hearing location(s).  The arbitrator may reallocate such costs and expenses among the parties in the award.

If a member firm fails to satisfy an invoice, FINRA Dispute Resolution will debit the member firm's CRD account.

This order will remain in effect unless amended by the arbitration panel.

Dated: _____

_____    Usher Winslett
Chairperson's Name and Signature

 Matt Fenster, approved by email dated March 17, 2021
_____
Panelist's Name and Signature

 Gerry E. Feinberg, approved by email dated March 17, 2021
_____
Panelist's Name and Signature

_____

[3] Industry Code: Rules 13214 and 13804(b)(6)(c)
[4] Industry Code: Rule 13804(b)(6)(A); Old Code: Rule 10335(b)(6)(A)

**FINRA Dispute Resolution Services Arbitration Number 21-00474**
**Virtu Financial, Inc. and Virtu Americas, LLC vs. Evan Wright**

**Supplement to Order on Request for Permanent Injunction:**

In determining the request for an injunction, the panel used New York law, per agreement of the parties.

In an action pending in New York Supreme Court, New York County Commercial Division (Index No. 651133-2021) (the "Court Action"), the court issued an order dated February 26, 2021 (the "Court Order"). Per the Court Order, the panel understands that a third-party firm, TransPerfect Legal Solutions ("TransPerfect"), currently possesses a forensic mirror image ("Respondent's Data") of Respondent's personal devices (including his personal desktop computer, his personal laptop computer, and his personal mobile phone) that he used to access Claimant's confidential information ("Respondent's Personal Devices").

The parties shall instruct TransPerfect to run a search of Respondent's Data for a list of keywords mutually agreeable to the parties, including without limitation the list of keywords attached to Claimants' First Amended Statement of Claim as Exhibit 11 (the "Search Terms").

The parties will instruct TransPerfect create a report (the "Report") that identifies (i) each file containing at least one of the Search Terms and (ii) the number of individual occurrences for each Search Term.

Based on the results of the Report, the parties may, upon mutual agreement, elect to revise the Search Terms and have TransPerfect create a "Revised Report" using whatever new set of Search Terms the parties agree to.

The parties will instruct TransPerfect to provide the Report or Revised Report (if such a Revised Report is created) to Respondent. As soon as practical, but no later than seven days from receipt of Report or Revised Report, Respondent will identify any item that he believes contains no

information belonging to Claimants (the "Personal Items") and add a brief description of each such Personal Item, creating an "Annotated Report".

Respondent will then provide the Annotated Report to Claimants. If the Claimants disagree with Respondents' designation of Personal Items, the parties shall then submit the disputed items to TransPerfect and instruct TransPerfect to opine on whether any of the disputed items contain information belonging to Claimants. If disputed items remain after TransPerfect's review, the parties shall submit those disputed items to the panel for in camera review and determination of whether they contain information belonging to Claimants.

Absent an agreement by the parties regarding the removal of any information belonging to Claimants from Respondent's Personal Devices, Respondent shall not delete or otherwise alter any of the information contained on Respondent's Personal Devices pending a further order by this panel.

As the parties have agreed to the jurisdiction of this panel, they shall jointly discontinue the Court Action.

Claimants shall pay TransPerfect's costs and fees associated with the above.

Costs in connection with the injunction hearing are assessed 50% to Claimants (jointly and severally) and 50% to Respondent.

# Exhibit 8

# 3/10/2021 Letter to Todd Gutfleisch

**One Liberty Plaza**
**New York, NY 10006**
**Tel: 1 646-682-6000**



March 10, 2021

Via Federal Express
Mr. Evan Wright
33 Sleepy Hollow Rd
Red Bank, NJ 07701

Dear Mr. Wright:

Please take notice that Virtu Financial, Inc. and Virtu Americas LLC (collectively, "Virtu") demand, pursuant to Section 15(v) of the Amended and Restated 2015 Management Incentive Plan and Section 7 of the related Employee Restricted Stock Unit and Common Stock Award Agreements, that you remit payment by March 16, 2021 to Virtu in the amount of $1,711,386.00 representing the current cumulative value of the vested stock awards granted to you from 2018 through 2020.

Virtu reserves, and in no manner waives, any and all rights at contract, law and equity.

Sincerely,

Thomas M. Merritt
Deputy General Counsel
Virtu Financial, Inc.

cc: Todd Gutfleisch, Esq. (via electronic mail)

# Exhibit 9

3/11/2021 Letter to Thomas Merritt



March 11, 2021

<u>**By Email**</u>
Thomas M. Merritt, Esq.
Deputy General Counsel
Virtu Financial
One Liberty Plaza
New York, New York. 10006

        **Re:    Virtu Financial and Evan Wright**

Dear Tom:

    We write in response to the demand by Virtu Financial, Inc. and Virtu Americas, LLC ("Virtu") that Evan Wright remit $1,711,386.00 by March 16, 2021 pursuant to Section l5(v) of the Amended and Restated 2015 Management Incentive Plan and Section 7 of the related Employee Restricted Stock Unit and Common Stock Award Agreements.

    Please detail (i) the basis under these provisions for Virtu's demand, including the specific alleged conduct relied upon (if any) in connection with the demand, and (ii) the calculations purportedly supporting Virtu's claim for $1,711,386.

    To be clear, Mr. Wright denies that the amount asserted, or any amount, is due to Virtu. It appears the demand is baseless and made in bad faith. Mr. Wright's rights and remedies are reserved.

                Sincerely,

                *Todd Gutfleisch*
                Todd Gutfleisch

Cc:    William Dugan (via email)
        Jacob Kaplan (via email)
        Justin Waldie (via email)

TODD GUTFLEISCH   tgutfleisch@HS-LAW.COM

HS-LAW.COM   MAIN (212) 397-3370 | FAX (212) 202-6206 | 40 WALL STREET, 53RD FLOOR, NEW YORK, NY 10005

# Exhibit 10

# 3/24/2021 Letter to Todd Gutfleisch

One Liberty Plaza
New York, NY 10006
Tel:  1 646-682-6000



March 24, 2021

Todd Gutfleisch, Esq. (*via electronic mail*)
Harris St. Laurent & Wechsler LLP
40 Wall Street, 53rd Floor
New York, NY 10005

Re: **Virtu/Wright**

Dear Mr. Gutfleisch:

This letter is submitted in response to your correspondence, dated March 11, 2021.

The basis of the demand by Virtu Financial, Inc. and Virtu Americas LLC (collectively, "Virtu" or the "Company") as set forth in my letter, dated March 10, 2021, is as follows: Mr. Wright has engaged and continues to engage in activity that is in conflict with or adverse to the interest of the Virtu by *inter alia* (i) breaching his Confidential Information and Invention Assignment Agreement, dated on or about May 28, 2013; and (ii) engaging in the misconduct set forth in the Company's First Amended Statement of Claim, FINRA Arb. No. 21-00474.

The calculations for Virtu's demand for a claw back payment from Mr. Wright of $1,711,386 are as follows: 61,012 shares multiplied by Virtu's closing price of $28.05 on March 9, 2021.

I trust this satisfies your request.  Please have Mr. Wright remit this amount to Virtu by no later than March 31, 2021.

Virtu reserves, and in no manner waives, any and all rights at contract, law and equity.

Sincerely,

Thomas M. Merritt
Deputy General Counsel
Virtu Financial, Inc.

cc: Justin Waldie, Esq.

# **Exhibit 11**

# 3/25/2021 Letter to Thomas Merritt

HARRIS

ST. LAURENT

WECHSLER

March 25, 2021

**By Email**
Thomas M. Merritt, Esq.
Deputy General Counsel
Virtu Financial
One Liberty Plaza
New York, New York. 10006

Re:    **Virtu Financial and Evan Wright**

Dear Tom:

We write in response to your March 24th letter.  We asked you two weeks ago to detail the bases and calculations underlying Virtu's cursory demand for payment of $1,711,386.00 from Mr. Wright.  You still have not done so.  Among other problems, Virtu has invoked Section 15(v) of its Amended and Restated 2015 Management Incentive Plan, and even in its meritless FINRA arbitration and related litigation proceedings, Virtu has not accused Mr. Wright of any conduct that falls within the terms of Section 15(v) (nor has Mr. Wright committed any such conduct). This only reinforces our belief that the demand is baseless and made in bad faith.

Nevertheless, in good faith, we ask again: please provide *facts* supporting Virtu's demand for over $1.7 million from Mr. Wright, and explain how, in Virtu's view, those facts give rise to any sort of claim under the Plan and Agreements Virtu has invoked.

As to the calculation of the $1,711,386, please specify when Mr. Wright was granted the 61,102 shares; provide all documents concerning those grants, including award agreement and plan documents; provide a schedule of his redemptions of those shares; and explain why (in Virtu's view) the price of $28.05/share would apply to Virtu's demand.

We reiterate that Mr. Wright denies that the amount asserted, or any amount, is due to Virtu.  Mr. Wright's rights and remedies are reserved.

Sincerely,

*Todd Gutfleisch*

Todd Gutfleisch

Cc:    William Dugan (via email)
       Jacob Kaplan (via email)
       Justin Waldie (via email)

TODD GUTFLEISCH    tgutfleisch@HS-LAW.COM

HS-LAW.COM    MAIN (212) 397-3370 | FAX (212) 202-6206 | 40 WALL STREET, 53RD FLOOR, NEW YORK, NY 10005